## MITCHELL'S CASE.

*New York Common Pleas; General Term, March,* 1861.

CONTEMPT.—PRIVILEGE OF WITNESS.—CONFIDENTIAL COMMUNICATIONS TO ATTORNEY.—EXAMINATION OF PARTIES.

If a judge or court has jurisdiction to commit for contempt, his adjudication upon the question of contempt or no contempt is final, and cannot be reviewed by appeal.

The case of Yates *a.* The People, 6 *Johns.*, 337, is no longer an authority upon any of the grounds relied on by Mr. Clinton in his opinion.

It is not the right of a witness to judge, except where the answer might criminate him, whether the matter inquired of is privileged or not. If the production of a document be called for, and the witness declines to produce it upon the ground that the reading of it in evidence would be prejudicial to his interests, or the interests of a person to whom he stood in a confidential relation respecting the instrument, the witness may be required to submit the document to the inspection of the court.

The refusal of a witness to produce papers acknowledged to be in his possession, for the reason that it would be a breach of his privilege as attorney, is assuming the right of determining for himself the question of privilege, which is not his province, but that of the court; and his refusal to produce the papers is a contempt.

Since, by the provisions of the Code of Procedure, a party may be compelled to testify in the same manner as any other witness, the privilege of an attorney founded on the former rule that a party could not be compelled to testify, is gone.

*It seems,* that a party to an action may be compelled, by *subpœna duces tecum,* to produce papers and documents upon the trial, to be used in evidence.

Papers intrusted to an attorney in professional confidence, are not necessarily to be deemed confidential communications, and if he swears that he is ignorant of their contents, they are not to be so deemed.

History of the privilege of the attorney.

Appeal from an order of commitment for contempt.

Mr. Mitchell was an attorney and counsellor-at-law, and was, as such, retained by, and acting for, one McKechnie, who was the defendant in an action brought by J. H. McCunn and J. Moncrief, in the Court of Common Pleas for the city and county of New York, to recover from McKechnie the possession of a certain lot of land in that city. Upon the trial of that action before his honor Judge Brady, one Bettz was examined as a witness for the defendant, and upon examination testified that he, Bettz, claimed the title to the land, that the defendant Mc-Kechnie was his tenant, and that he, Bettz, was defending the action as the landlord of the defendant; and being asked whether he had in his possession any old deeds, leases, or assignments relating to the land, he answered that he had received from his grantors a certain old lease and other papers, which he had kept in his possession until a few days before the trial, when he had delivered them to John W. Mitchell, his attorney, and the attorney of the defendant in the action; and being asked to produce the said old lease and other papers, he answered that he was unable to do so, because they were in Mr. Mitchell's possession. Mr. Mitchell was then in court, acting as the attorney and counsel of the defendant on the trial. He was thereupon called as a witness by the plaintiffs, and on his examination, being asked: Have you in your possession any old leases or deeds relating to this property, placed there by Mr. Bettz? replied, that he had some papers of Mr. Bettz's, but that he did not know what they were; and on being requested by the court to examine the papers and see, he declined to do so, objecting on the grounds that he was privileged from testifying as to such matters, they having come to his knowledge from his client, that he had not been subpœnaed, and that he had had no notice to produce the papers.

During a brief suspension of the proceedings pending this examination, Mr. Mitchell delivered the bundle of papers to Mr. Bettz, with a suggestion that he carry them to the office of his counsel.

After the proceedings were resumed, this fact appearing upon the continued examination of Mr. Mitchell, the plaintiffs applied for an attachment for contempt against him; but it was

finally arranged that the application should be suspended, and the cause adjourned, upon a stipulation that Mr. Mitchell should appear on the adjourned day with the papers in the same.

On the same day, Mr. Mitchell was served by the plaintiffs with a *subpœna duces tecum*, requiring him to produce the papers on the adjourned day.

After further adjournment, the parties appeared on the 27th of May, and Mr. Mitchell, being called to the stand and asked if he had brought with him the bundle of papers in question, replied that he had. Being requested to look at them, and inform the court whether they related to the lands in suit, he refused to do so.

The court thereupon ordered the witness to be committed for ten days to the county jail, for contempt of court.[*] From this order the present appeal was taken.

BY THE COURT.—DALY, F. J.—I was of opinion, upon the argument, that this appeal should be dismissed upon the ground that an order made by a judge of a court of record in the course of a trial, committing a person for a contempt in open court, was an exercise of discretion which ought not to be reviewed by an appellate tribunal; but as Yates *a*. The People (6 *Johns.*, 337) was relied upon as an authority to the contrary, our decision was reserved for a more careful consideration of the question.

Governor Clinton, who gave the only opinion on the part of the majority of the Court of Errors, upon the final decision of Yates *a*. The People, was in favor of the exercise of the right of review upon the merits, in every commitment for contempt; declaring that there was nothing sacred in commitments of that description; nothing that forbade the hand of justice from extending relief; nothing that invested the higher courts with unlimited, uncontrolled powers over personal liberty whenever they thought fit to impute contempt. But, after a careful examination of this voluminous case, I do not understand that he put his decision upon that ground; but if he did, all the points involved in the final decision of the case, came again under

---

[*] The commitment will be found in our report of the proceedings on a habeas corpus, issued by a justice of the Supreme Court, to inquire into his detention, 7 *Ante*, 96.

review in the case of Yates *a.* Lansing (9 *Johns.*, 395), before the same court, when Judge Platt, referring to the former decision, said, " a majority of the members voted for reversing the decision of the Supreme Court, but whether upon the ground taken and the reasons assigned by Mr. Clinton, it is impossible to know. It is certain that a majority agreed in the result, but there is no certainty that any two of that majority grounded their opinions upon any one of the various points that were discussed and relied on by Mr. Clinton ;" and though the maxim, *Stare decisis et non quieta movere,* was very strongly pressed, the court allowed all the questions to be argued over again ; and when Yates *a.* Lansing came to be decided, Judge Platt, who delivered the only opinion which is reported on the part of the majority, repudiated all the grounds which were relied · upon by Governor Clinton in the former decision ; in addition to which, two of the principal propositions upon which he relied were repudiated by subsequent legislative enactments (3 *Rev. Stat.;* 5 ed., art. 1, tit. 2, ch. 3, part 3, § 15 ; art. 3, tit. 6, ch. 1, part 4), while others are now provided ·for and regulated by statute (3 *Rev. Stat.,* 849, tit. 13, 5 ed.) ; so that Yates *a.* The People is no longer an authority upon any of the grounds supposed to have been involved in its final decision.

In respect to the doctrine advanced by Governor Clinton, that every commitment for a contempt should be subject to review, Judge Platt, in Yates *a.* Lansing, commented in these words : " The right of punishing for contempts, by summary conviction, is inherent in all courts of justice and legislative assemblies, and it is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our State Constitution. The discretion involved in the power is, in a great measure, arbitrary and undefinable ; and yet the experience of ages has demonstrated that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice. The known existence of this power prevents, in a thousand instances, the necessity of using it, and is, perhaps, the strongest reason why it is so seldom abused."

It is evident, from ·the language of Gov, Clinton, that he was not familiar with the reasons which had led to the recognition of this salutary principle. It is very apparent that he had never looked into the authorities, nor had his attention

drawn to the practical difficulties that would ensue if a judge upon a trial could not compel a witness to answer a question or produce a paper until it was settled by the court of last resort that it was the duty of the witness to do so. Forty years before, Blackstone declared, in Crosby's Case (3 *Wils.*, 188), that " the sole adjudication of contempts and the punishment thereof in any manner, belong to each respective court; that the Courts of Westminster Hall could have no control in matters of contempts; and that infinite confusion and disorder would follow, if courts could examine and determine the contempts of other courts; that the power to commit results from the first principles of justice, for if they (the courts) have power to decide, they ought to have the power to punish; and that the judgment and commitment of each respective court as to contempts, must be final and without control. General convenience must always outweigh particular inconvenience." And, in the same case, Lord Chief-justice Dr. Grey said: " In the case of a commitment by this court (the Common Pleas) or the King's Bench (for a contempt), there is no appeal;" and to the objection that there may be abuses by jurisdictions where there is no appeal, he answered, that in some courts, dependence must be placed upon their discretion, and they must be left to the obligation of their oaths; that this was a principle which had its foundation in necessity.

The question was fully examined by Chief-justice Bibb, of Kentucky, in Johnston *a.* The Commonwealth (1 *Bibb*, 598), and was disposed of by that able judge with characteristic ability. After declaring that the exercise of discretion in such a matter on the part of the judge resulted from the very nature of the judicial establishment, he said: " The purposes for which courts are intrusted with the power of punishing for a contempt demands a speedy and summary proceeding not consistent with the delay consequent upon writs of error and appeals. If free from the apprehension of immediate punishment, the contemptuous witness, in the face of the court and in the very act of trial, might paralyze the hands of justice by refusing to give evidence." He truly remarked that the power to administer the law depended upon the respect felt by the people for the authority of courts, observing that that court is impotent and contemptible indeed whose power to punish a contempt of its

authority depends upon the discretion of a superior tribunal. In The King *a.* Davidson (4 *B. & Al.*, 329), the propriety and necessity of leaving such a matter entirely in the discretion of a judge of a court of record was recognized by all the judges. Justice Bayley said: "Of the power of a judge to 'fine for a contempt of court, I have not the least doubt, and I am of opinion also that the judge alone is competent to determine whether what is done be or be not a contempt, and that neither this court nor any other co-ordinate court has a right to examine the question whether his discretion in that respect was fitly and properly exercised;" and to the same effect is The King *a.* Faulkner (5 *Tyrwhitt*, 915). In The King *a.* Davidson, the fine was imposed at *nisi prius* by one of the judges of the same court where the question was brought under review, and is in that respect a parallel case with the one now before us.

To a certain extent the right of review exists;—as where the court or officer had no jurisdiction to commit (Seamen *a.* Duryea, 1 *Kern.*, 324), or has exceeded his jurisdiction by imposing a greater punishment than is allowed by statute (Bickley *a.* The Commonwealth, 2 *J. J. Marshall*, 572), or where a statute prescribes certain acts to be done as essential to the validity of the commitment; and they are omitted (People *a.* Nevins, 1 *Hill*, 154), as, for instance, in this State, where it is required by statute that in commitment for contempt in criminal cases, the order or warrant of commitment shall specify the particular circumstances of the offence (3 *Rev. Stat.*, 5 ed., 470, § 14); and in civil cases, where the misconduct consists in the omission to perform some act or duty, that the order or process of commitment shall specify the act or duty to be performed, and the amount of the fine, and expenses to be paid; and in other cases, that the order or process of commitment shall specify the duration of the imprisonment (3 *Rev. Stat.*, 5 ed., 853, §§ 23; 24, 25); so the right of review exists where the alleged contempt consists in disobeying an injunction, and the court has no jurisdiction to grant an injunction, the whole proceeding being *coram non judice* (People *a.* Sturtevant, 5 *Seld.*, 263, and in analogous cases; Baltimore & Ohio Railroad *a.* Wheeling, 13 *Grattan*, 40); but it is settled by numerous decisions, both in this country and in England, that if the judge has jurisdiction to commit for a contempt, his adjudication upon the question of contempt

or no contempt is final, and can never be inquired into, either by the appellate tribunal of his own court, or by any other jurisdiction whatever. (The State *a.* Tipton, 1 *Blackf.*, 166; Cossart *a.* The State, 14 *Barb.* (*Ark.*), 538; Patton *a.* Harris, 15 *B. Munroe* (*Ky.*), 607; The State *a.* Woodfine, 5 *Iredell* (*Law*), 199; Lockwood *a.* The State, 1 *Carter* (*Ind.*), 161; *Ex parte* Kearney, 7 *Wheat.*, 38; Martin's Case, 5 *Yerg.*, 456; Neel *a.* The State, 4 *English* (*Ark.*), 259; Commonwealth *a.* Dandridge, *Virginia Cases*, 409; People *a.* Turner, 1 *Cal.*, 188; Burdett *a.* Abbott, 14 *East*, 1; Ib., on appeal, 5 *Dow.*, 165, 199; Stockdale *a.* Hansard, 9 *Ad. & E.*, 1; Sheriff of Middlesex's Case, 11 *Ib.*, 273; Earl of Shaftsbury's Case, 6 *How. State Trials*, 1269; *On rel.* Cobbet, 2 *B.*, 187; *On rel.* Crawford, 13 *Jurist*, 955; 18 *L. J.*, 225; Regina *a.* Paty, 2 *Lord Raym.*, 1105; Murray's Case, 1 *Wils.*, 299.)

In the late English case of Stockdale *a.* Hansard, cited above, which was a commitment by the House of Commons for a breach of privilege, the general rule was qualified to the extent that where the grounds of commitment are set forth in the warrant, and it appears that the House of Commons have no such privilege, the court will interpose and discharge the prisoner, as the court can see from the facts set forth in the warrant of commitment that there could be no contempt. But in the subsequent case of the Sheriff of Middlesex (11 *Ad. & E.*, 273), it was held that the grounds of commitment need not be set forth in the warrant, and that where a court, officer, or legislative body have committed for contempt generally, it will be presumed that there was sufficient reason, and the court will not suffer any inquiry to be made, or the warrant to be contradicted by affidavit. The rule to be extracted from these cases is, that when the commitment is by a legislative body, and the warrant declares the grounds of adjudication, the Court of King's Bench will examine into their validity; but if it does not, they will not go into such an inquiry. But this rule would have no application to a case like the present. A commitment by the House of Commons is a quasi criminal proceeding, and the King's Bench being the chief criminal court of the kingdom, will discharge from arrest when it appears by the showing of the House of Commons itself, upon the face of their warrant, that no offence has been committed; and so in this State, as

the statute requires, in commitments for contempt in criminal cases, that the particular circumstances of the offence shall be set forth in the order or warrant of commitment, the Supreme Court may discharge the prisoner, if it appear from the grounds stated that no contempt was in fact committed. In two cases in Pennsylvania (Hummel's Case, 9 *Watts*, 416; Commonwealth *a.* Newton, 1 *Grant's Cases*, 453), it was held by the Supreme Court, that they would review commitments for contempt which were quasi criminal proceedings; but the decision was put upon the ground of the obligatory terms of the statute regulating the appellate jurisdiction of the court, and is therefore of no weight beyond the limits of that State.

But though the ground above stated is sufficient for the disposition of the case, and I desire, if my brother Hilton concurs, to put our decision upon that ground alone, still I feel that it is due to Judge Brady, as I would feel it to be due to any judicial tribunal whose acts were brought in question under similar circumstances, to declare that what he did was essential to maintain the authority of the court, and that his proceeding, in every particular, is sustained by the authority of adjudged cases. It appears from what is stated in the order appealed from, and in the warrant of commitment which is informally before us, that the action upon trial was a suit for ejectment, and that a witness named Bettz was examined, and stated that he claimed title to the land; that the defendant was his tenant, and that he was defending the action brought against his tenant; and it also appears that the appellant Mitchell was the attorney for the defendant, and the professional adviser of the witness Bettz. In the course of the examination of Bettz, he was asked if he had in his possession any old deeds, leases, or assignments relating to the land, to which he answered that he had received from his grantor a certain old lease and other old papers, which he had kept in his possession until a few days before the trial, when he delivered them to Mitchell, his attorney, and that he was unable to produce them, as they were in the possession of Mitchell. Mitchell was then placed upon the stand, and being sworn as a witness, was asked if he had in his possession the lease and papers referred to by Bettz, and he answered that he could not say without looking into a bundle of papers which he had then with him in court. The judge then requested him to

Mitchell's Case.

look into the bundle, which he refused to do. A motion was then made for his commitment, pending which Mitchell gave the old lease and the other papers to Bettz, instructing him to take them from the court to the office of his counsel, Mr. Chatfield. The cause was then adjourned until another day, upon which day the examination of Mitchell being resumed, he admitted that he had in his possession the lease and papers received from Bettz, having in the interim obtained them from Chatfield. He was then asked if he would state what they were, and he replied that he could not without examining them. He was then asked to do so, and state what they were, so far as to identify them, which he refused. The judge then directed him to do so, or produce the papers, but he refused, giving as his reason for refusing, that it would be a breach of his privilege as attorney for the defendant. It appears by the warrant, that the questions put were material and pertinent to the issue, and for this refusal the court adjudged him guilty of contempt, and committed him to the county jail for ten days.

The mistake of Mr. Mitchell, putting the most charitable construction upon his conduct, was in supposing that he, and not the court, was to be the judge of the question of privilege; and also that his relation as attorney entitled him to withhold evidence which his client could be compelled to produce.

Before the important change in the law requiring a party to an action to be examined as a witness at the instance of the adverse party, the general principle was recognized, that no one in a court of law could be compelled to give evidence against himself. (Cook *a.* Corn, 1 *Overt.*, 340.) This principle had its most extensive application where the question put to a witness would or might have a tendency to expose him to a criminal charge or penal liability, or to any kind of punishment; and so far as protecting a party from an inquiry that may have such a tendency, this broad principle of the common law remains untouched. In such a case, as the witness knows what the court does not know, and which he could not communicate without becoming his own accuser, he is permitted to judge for himself what the effect of his answering the inquiry would be; the power of the court being limited simply to determining whether the question is one that might admit of an answer having such a tendency. (1 *Burr's Trial*, 245.) The shelter of the princi-

ple extends also to every thing confidentially communicated by the party to his attorney, and it is for the attorney, as it would be for the party, to judge what would be the effect of the inquiry. Thus in Rex *a.* Dixon (3 *Burr.*, 1687), it was held that an attorney was justified in disobeying a *subpœna duces tecum* directing him to bring before a grand jury certain papers which had been placed in his hands confidentially by his client, where the object in requiring him to do so was to found a prosecution against his client for forgery.

But the principle that a party should not be compelled to give evidence against himself, was far more limited in its application when no question of crime was involved, both in relation to the obligations of the witness and the power of the court in determining whether he should be absolved from answering or not. The principle of exemption was applied in its broadest extent to parties to actions at law, who could not be compelled to give evidence; and in respect to the production of documentary testimony, as a party to an action was not bound to give evidence, he could not be required to produce papers to be used against him as evidence; and if a paper had been deposited by him with his attorney, the attorney's possession was deemed the possession of the party, and the attorney could not be required to produce it, nor even any other person having the temporary possession of it in right of the party. (Bank of Utica *a.* Hillard, 5 *Cow.*, 419.) If a document was in the possession of the party to an action at law, or in the possession of his attorney, all that could be done was to give him notice to produce it; and if he failed to do so, the other party was at liberty to give secondary evidence of its contents; or if the production of the document itself was essential, and he would not produce it, the court would, if he was a defendant, strike out his answer, or if a plaintiff, nonsuit him (3 *Rev. Stat.*, 5 ed., 293, 294; 4 *Cowen & Hill's Notes*, 3 ed., 648)—a practice introduced into courts of law from the Court of Chancery.

But the attorney might be called, and was bound to answer whether or not he had the paper in his possession, that the other party might be enabled to give secondary evidence of its contents, which he could not do until he had first shown that he was unable to produce it; and though the attorney could not be required to disclose the contents of the paper, his examina-

tion might be carried at least so far as to show, with reasonable certainty, that the document in his possession was the one respecting which the other party proposed to give evidence. (Bevan *a.* Waters, 1 *Moo. & M.*, 235; Eicke *a.* Nokes, *Ib.*, 303; Rhoades *a.* Selin, 4 *Wash. C. C. R.*, 715, 718; Coventry *a.* Tannahill, 1 *Hill*, 33; Jackson *a.* McVey, 18 *Johns.*, 330; Brandt *a.* Klein, 17 *Ib.*, 335; 1 *Greenleaf's Ev.*, §§ 241, 245; *Cowen & Hill's Notes to Phillips*, 3 ed., part 2, note 152.) The protection of this rule was also applied, to a certain extent, in favor of witnesses called on behalf of third persons. Neither they nor their attorneys, if called as witnesses, could be required to produce documents to be used in evidence, if the production of the paper might materially affect the rights or prejudice the interests of the witness or person to whom it belonged, which was a question which the court would determine, upon the inspection of the document. (Copeland *a.* Watts, 1 *Starkie*, 95; Bull *a.* Loveland, 10 *Pick.*, 9; Amey *a.* Long, 9 *East*, 473; Bateman *a.* Phillips, 4 *Taunt.*, 157; Field *a.* Beaumont, 1 *Swanst.*, 209; *Cowen & Hill's Notes*, 3 ed., part 2, note 316; 1 *Greenleaf on Evidence*, § 246; *Dunlap's Practice*, 607.)

The rule was also well established, that neither a party nor his legal adviser would be compelled in a court of justice to disclose the confidential communication which had passed between them in respect to the matter upon which the party had sought professional advice. The principle, which appears to have been recognized as far back as the days of Elizabeth (*Cary's R.*, 127, 88, 89), was not confined to courts of law, but was equally acted upon by the Court of Chancery, where the aid of that court was sought to compel a discovery of evidence. On an application for a discovery, a court of equity would neither compel nor permit a solicitor to disclose what his client had communicated to him in professional confidence, nor compel the production of letters which had passed between them, or through intermediate agents upon the business, containing or asking legal advice or opinions, nor cases prepared at the instance of the client for the opinion of counsel. (Lord Walsingham *a.* Goodricke, 3 *Hare*, 122; The Mayor of Dartmouth *a.* Holdsworth, 10 *Sim.*, 476; Bolton *a.* The Corporation of Liverpool, 3 *Ib.*, 467; Hughes *a.* Biddulph, 4 *Russ.*, 190; Nias *a.* The Northern & Eastern Railway Co., 2 *Keen*, 76; Bunbury *a.*

Bunbury, 2 *Beaven*, 173 ; Greenough *a.* Gaskell, 1 *Myl. & K.*, 98; Holmes *a.* Baddeley, 1 *Phillips*, 476 ; Walker *a.* Wildman, 6 *Madd.*, 48 ; Bank of Utica *a.* Merserau, 3 *Barb. Ch.*, 528 ; March *a.* Ludlum, 3 *Sandf. Ch.*, 35.) Both courts of law and of equity recognized the necessity of a free and unrestricted intercourse between the client and his professional adviser, which would not exist if what was imparted by the former in professional confidence could be afterwards used against him. Every thing of this nature was regarded therefore as inviolate, and neither the client, to a certain extent, nor his professional adviser, would be required either at law or in equity to disclose it. As this was a rule, however, susceptible of great abuse, it was always kept within just and rational limits. As it has, in the language of Chief-justice Shaw, in Foster *a.* Hall (12 *Pick.*, 89), " a tendency to prevent the full disclosure of the truth, it is to be construed strictly;" to which may be added the very pertinent observation of Lord Langdale, the master of the rolls, in Nias *a.* The Northern & Eastern Railway Company (*supra*), upon what he deemed a too extensive application of it : " It seems strange to say that justice can be promoted by concealing the truth, by suppressing the knowledge of any fact or any statement of the parties which bear upon the question to be decided. It is often easier to exclude evidence than to determine what weight ought justly to be attributed to it when received. A bad cause may suffer, and the evasion of justice may be prevented by compelling the party to disclose a material fact ; but the object is not to save the trouble or lessen the responsibility of the judge to protect a bad cause or to facilitate the evasion of justice, but, if possible, to do justice, and for that purpose to get at the whole truth, and, I confess I have yet to learn how the concealment of the truth, or hiding from the court that which is known to any of the parties, and relates to the matter in question, can in any way promote justice."

Wherever, in the practical application of these rules, the question of privilege arose, it was not, as Mr. Mitchell seems to have supposed, the right of the witness to judge, except where the answer might criminate him, whether the matter inquired of was privileged or not. That was the province of the court. If the production of a document was called for, and the witness declined to produce it, upon the ground that the reading of it

in evidence would be prejudicial to his interests, or to the interest of the person for whom the witness acted as attorney, the witness was required to submit the document to the inspection of the court, and if the judge, after perusing it, differed from the witness, he would direct it to be read (Copeland *a.* Watts, 1 *Starkie*, 95; Bradshaw *a.* Bradshaw, 1 *Rus. & Myl.*, 358; Walsh *a.* Trevanion, 15 *Sim.*, 578); or if a witness swore that a question put to him could not be answered without the disclosure of secrets communicated to him by his client, it was for the court to determine from the nature of the inquiry whether the principle of protection extended to it or not (Morgan *a.* Shaw, 4 *Madd.*, 57; Parkhurst *a.* Lawten, 3 *Ib.*, 121; Beer *a.* Ward, *Jac.*, 77; Commonwealth *a.* Braynard, *Thatcher's Cr. Cas.*, 146); and if the court decided that it did not, the witness, should he refuse to answer, would be deemed guilty of a contempt, nor would the court even hear counsel upon the validity of the witness's objection. (Doe *a.* The Earl of Egremont, 2 *M. & Rob.*, 386.)

Such was the state of the law before the enactment of the provision compelling parties to action to be examined as witnesses at the instance of an adverse party. That provision has brought about a very material change; but before proceeding to inquire into the effect of the enactment upon the question of privilege, it is very plain, that by the law as it stood before this change was made, the conduct of Mr. Mitchell amounted to a contempt. His refusing to produce papers acknowledged to be in his possession, for the reason that it would be a breach of his privilege as attorney for the defendant, was assuming the right of determining for himself the question of privilege, which was not his province, but that of the court; and his disobedience of the order of the judge to produce them, was a very plain case of contempt, upon the authority of the cases that have been cited. It was a contempt to wilfully deprive the court of the means of determining whether the principle of protection extended to the papers in his possession or not, and it would not be the less a case of contempt, even assuming that, upon what was stated to the court, a case of privilege was shown; for though a judge should decide erroneously upon the question of privilege, the order he makes is nevertheless to be obeyed. If it were otherwise, it would always be in the power of a witness

to withhold evidence whenever he thought fit to consider himself privileged.

But Mr. Mitchell was mistaken, since the enactment above referred to, in supposing that he had any privilege at all. The exemption of the attorney was never regarded as his personal privilege, but as existing purely for the protection of his client (*Butler's N. P.*, 284); and even though willing or desirous to do so, he would not be allowed, unless by his client's consent, to reveal any thing intrusted to him in professional confidence. (Petrie's Case, cited in 4 *T. R.*, 756.) He was, in this respect, in the language of Chief Baron Gilbert, "considered as one and the same person with his client" (*Gilbert on Evidence*, 138); and if, by a change in the law, a party to an action has no longer any privilege, it follows as a matter of course, that his attorney can have none. The provision in question declares, that "a party to an action may be examined as a witness, at the instance of the adverse party, and for that purpose may be *compelled to testify in the same manner*, and subject to the same rules of examination, as any other witness." This sweeps away the rule of the common law, that parties to actions should not be compelled to give evidence against themselves; and every privilege, either of the party or of his attorney, that was founded upon it, is gone. I suppose that the protection that was extended to the confidential communications between attorney and client remains unaffected, as the reason upon which that rule was founded is as applicable now as it was before; but with this exception, a party to an action, or his attorney, are no longer privileged to withhold testimony. A party to an action may now be compelled, by a *subpœna duces tecum*, to produce papers and documents, upon the trial, to be read in evidence. (Bonesteel *a.* Lynde, 8 *How. Pr.*, 226.) The contrary was held by Justice Roosevelt, in a previous case (Trotter *a.* Latson, 7 *Ib.*, 261); but the construction he put upon the statute was repudiated, after a careful examination, by Justice Wells, and I entertain no doubt but that the conclusion arrived at by the latter was the correct one. If a party, then, may be compelled to produce documents, the attorney, whose privilege can be no greater than that of his client, must be equally bound. In Doe *dem.* Courtail *a.* Thomas (9 *Barn. & Cres.*, 288), which was an action at law, an attorney was called upon to produce a lease,

Mitchell's Case.

who declared that he had received it from his client in the character of his attorney, and that he held it in that character; but it appearing that the client had been ordered, by the Court of Chancery, to deposit the lease for the inspection of the plaintiff, in a suit brought by the plaintiff against the client in the Court of Chancery, the court ordered the attorney to produce the lease; and when the case came up for review, Lord Tenderden held that the client might have been subpœnaed upon the trial and compelled to produce the lease, and that if he could be compelled to produce it, then the attorney, who stood in the same situation as his client, was equally bound to do so. If this were not so, all that a party would have to do to evade the production of papers, would be to put them into the custody of his attorney. "The production of written as well as oral testimony," said Lord Ellenborough, in Amey *a.* Long (9 *East*, 473), "is essential to the very existence and constitution of a court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed with due effect without them;" holding that the writ of *subpœna duces tecum* was as essential and of as compulsory obligation as the ordinary writ by which a witness is commanded to appear and testify. The object sought in the examination of a witness, is to obtain from him not only the evidence which he may give orally, but the written evidence which may be in his possession or under his control. One is as much a part of what he is called upon to furnish, and in respect to which he may be examined, as the other. When the Code, therefore, declares that a party to an action may be compelled to testify in the same manner, and subject to the same rules of examination, as other witnesses, it is obvious that the meaning is, that whatever may be required of other witnesses may be required of him. If they must produce books and papers, so must he; and if he has placed them in the possession of his attorney, agent, or any other person, the one who has them in actual custody may be compelled to bring them before the court, to be used as evidence. In courts of equity, the principle of protection was never extended to all papers belonging to a client which he may have put into the hands of his solicitor; but the general rule was, that whatever the client was bound to produce for the benefit of a third person, his solicitor, if the document or paper was in his possession,

was also bound to produce it (Furlong *a.* Howard, 2 *Schoele & Lefray*, 115; Fenwick *a.* Reed, 1 *Merivale*, 114); and if the solicitor was not a party to the suit, he might be compelled, by a *subpœna duces tecum*, to produce it. (Busk *a.* Lewis, 6 *Madd.*, 29.) Indeed, the principle of protection recognized in courts of equity, does not appear to have extended, so far as the adjudged cases show, beyond letters or other communications passing between the client and his solicitor or their intermediate agents, or papers or documents prepared by the solicitor at the client's request, and in certain cases to the title-deeds of the client in the hands of his solicitor (Stratford *a.* Hogan, 2 *Ball & Bea.*, 164; McCann *a.* Beere, 1 *Hog.*, 129), or to a general application upon a solicitor to produce his client's papers. (Wright *a.* Mayer, 6 *Ves.*, 280.) The general rule of courts of equity, that wherever the client may be called upon to produce papers, the attorney, if they are in his possession, may be required to produce them, is the proper rule, now that parties to actions are made witnesses. There may possibly be cases in which the deposit of a document with an attorney for advice and counsel, may bring it within the rule of protection; though I can conceive of none, if the client would himself be bound, if he had it in his possession, to produce it as a witness.

In this case, however, there could be no pretence that the papers in question were left by the witness Bettz with Mitchell for professional advice and counsel, as Mitchell declared that he could not tell what they were without examining them; nor, when first interrogated respecting them, whether he had them in his possession or not, without looking into a bundle of papers which he had with him in court. He was, therefore, either ignorant of their nature and contents, or else he stated what was untrue. We are bound to presume the former; and if he did not therefore know what they were, the fact that they were left with him in professional confidence would not protect them. In Walsh *a.* Trevanion (15 *Sim.*, 577), a solicitor was required, upon interrogations put to him as a witness, to produce certain papers in his possession, and he demurred to the interrogatory upon the ground that he received the papers in the character of the confidential solicitor of the persons to whom they belonged; but Sir Lancellot Shadwell, the vice-chancellor, held, that he might have received the papers in his character of confi-

dential solicitor, and yet the papers themselves might not be confidential communications, and he held the demurrer to be insufficient. Mr. Mitchell did not declare that the papers had been left with him by Bettz for professional advice or assistance, but he put his objection upon the ground that to produce them would be a breach of his privilege as attorney for the defendant. They were not placed in his hands by the defendant, but by the witness Bettz; and if any privilege could exist, it must have been as the attorney of Bettz, who, as the owner of the land, was defending the suit against his tenant; but he had no privilege either as the legal adviser of Bettz, or as the attorney of the defendant. Either of them could have been examined as witnesses, and required, if they had the papers in their possession, to produce them; and he could have no privilege where they had none. Upon both grounds, therefore, it was a case of contempt: first, because it was the right of the judge to determine whether there was any privilege or not, and the duty of the witness to be governed by his decision; and secondly, because he had no privilege entitling him to withhold the papers in his possession from being given in evidence.

The appeal should be dismissed.

HILTON, J.—For the reasons assigned by Judge Daly, I agree that this appeal should be dismissed; and I also concur in his views upon the other propositions examined by him.

---

## BLASON a. BRUNO.

*Supreme Court, First District; Special Term, May,* 1861.

ARREST.—FRAUD BEYOND THE STATE.—AFFIDAVIT ON INFORMATION.

The offence of disposing of property to defraud creditors, committed in a foreign country between foreigners, does not render the fraudulent debtor liable to arrest in an action brought here by his creditor.

An affidavit on which to obtain an order of arrest setting forth facts on information and belief, must state the sources of information.