Bissell, J.,
delivered the opinion of the court.
This is an action for personal injuries. In September, 1892, the appellants, The Colorado Fuel and Iron Company, were operating a rolling mill in Pueblo, wherein Cummings, the appellee, was employed, and at which he was injured on the 80th of the month. It is exceedingly difficult, if not impossible, without the aid of the photographs which were furnished the court, to describe to one who is unfamiliar with a steel mill the exact situation of the circumstances under which the appellee was hurt. With this limitation the case will be stated.
Located at one end of the mill, or at a point somewhat *543 remote from the roller, is a soaking pit', from which steel ingots, five or six feet long, and weighing some twenty-eight to thirty-four hundred pounds, are taken and run on a tramway of rolls to the table of the machine, which is called a “ roller,” and by which the ingot is rolled through a various set of rolls of progressive sizes until it has been greatly lengthened, and from being square has become a long flat piece of steel. The rolls are fastened in a frame, beneath which is a table on which the ingot rests. The table receives its motion through a system of cogwheels, and the bed of it consists of rolls, which carry the ingot forward underneath the rolls themselves, and the joint action of the rolls proper, as well as those of the table, carry the ingot through the machine. It is then brought back to its former position under that or another roll further along in the machine. There seems to be two sources of power; the motion of the cogs being furnished by an engine and the upward pressure of the table by an independent hydraulic machine. It is unimportant in what form the power is provided. At all events, the table is raised and lowered by hydraulic power, and when it first receives the ingot it is substantially level with the floor of the mill, and raised several feet therefrom when the ingot is to be subjected to pressure and the action of the rolls. The framework of the machine is called its “housing.” Along the side of the table there is a steel guard bolted on to it, which prevents the ingot from sliding off, and which projects quite a distance above’ the common level of the rolls, though it is fixed at the edge of the table and within the inner line of the cogs themselves. The machinery is under the direction and control of the “ lever-man ” or “ motorman,” as he is indiscriminately called. He stands at a lever in the rear of the machine which controls the hydraulic power, and he also manages the steam power which otherwise runs and operates the roller. The helper’s station is near the framework of the machine. Ordinarily he is out of sight of the motorman, under whose direction he is while he is discharging his duties. These seem to be to *544 keep tlie ingot in place ; to see that it enters the rolls properly, and to keep the machinery free from the flakes or scales which are constantly made and put off from the ingot as it is subjected to pressure. These scales, of course, fall directly under the rolls, and gather about what is called a “ shoe ” inside the housings and along the framework or platform below, which sustains the weight of the machine when it is lowered. Above the rolls there is a pipe which discharges water onto them when they are in motion to preserve a uniform temperature and prevent them from getting exceedingly hot. The water is discharged from the pipe through a valve, which is opened or closed by the helper, either as directed by the motorman, according to the defendant’s testimony, or, as the appellee says, as he may judge the situation to require it. There is considerable controversy in regard to the way in which the mill is lighted up, and as to a necessity for the electric light which is sometimes used, and which was charged by the plaintiff to be out of .order and the occasion of his accident. Some year or more prior to the accident, the company had put in an electrical plant and had an electric light near the soaking pit, and some distance from the roller where Cummings was working. The works had been operated for many years without artificial light, other than what was furnished by torches. The light which always came from the furnaces when they were in operation, and that furnished by the ingot, so lighted the vicinitjr, according to the testimony of one of the witnesses, that you could see to pick up anything ten or twelve feet away from the roller. The witnesses differ as to the condition of the' electric light at the time of the happening of the accident. The plaintiff asserted it went out and others that it burnt brightly. The conclusions of the jury were probably with the plaintiff. According to the general testimony, the electrical plant had been for many months in a bad condition. 'The light went out frequently, sometimes every few minutes, and sometimes some six or eight or a dozen times in the course of a night. The plaintiff had been working there *545 during all this time and had full knowledge of the condition of the plant in this respect. According to Cummings’ story, they had run three ingots through the roller prior to the accident. This made what he called a “heat.” After a heat the roller would usually remain idle for fifteen minutes or more. According to his story, he discovered the water was not running freely through the valve, and he stepped with his left foot onto the guard, grasped a rod with his hand, and started to raise his right foot to place it on the guard, whereby he could reach the valve and open it, when the machinery suddenly started. Because of the extinguishment of the light he was unable to see where he put his right foot, and it was caught by the cogs, his big toe cut off and the foot otherwise mashed, which necessitated its amputation between the toes and the instep. He charges the accident was caused by the extinguishment of the light, which rendered it impossible for him to see. Witnesses differ respecting the condition under those circumstances; those for the defense testifying that the light from the furnaces, which were running, although the doors were more or less closed, and from the heated bars and ingots, which were either on the shears table or at the pit, furnished light enough to enable anybody to do their work without the aid of an electric light. A good many witnesses testified work had been done for years without any other aid than light coming from these sources. The plaintiff’s knowledge of the defective condition of the electrical plant is conceded. To escape the force of that knowledge he testified to a conversation with Mr. Ellsworth, whom he termed the “ electrician,” which in substance was that he met Ellsworth when on his way to work that night and asked him how the lights were. Ells-worth’s response was that they were all right, and if he’made as much tonnage as the lights would show him he was all right. The plaintiff, stated he relied on this statement and believed that the lights would be satisfactory. He makes no attempt to show a complaint on his part and a promise on the part of the corporation to remedy the difficulty. Ac *546 cording to Cummings’ own storjr, he got on the frame to regulate the valve without any order from the motorman and without informing him in any way that he intended to do that particular act. The defendant’s witnesses testified, substantially, the helper was under no obligation to attend to the water except on direction of the motorman. Whether this be or be not true, it is im contradicted that he should not have proceeded to step on the machine to adjust the valve without informing the motorman of his intention. If he proceeded otherwise, he did it at the peril of his life, for the motorman took no notice whatever of the helper in running the machine, except as he might be informed by the helper of his purpose to do some particular thing which required the machinery not to rym. The plaintiff states he got no order and that he did not communicate with the motorman and indicate his purpose to adjust the valve. The injury, according to Cummings’ story, came from the starting of the machinery while he was doing this act. The cogs ran with great rapidity, from 100 to 300 revolutions a minute, and, of course, the plaintiff was in very great danger when he stepped onto the framework of the table if the machinery started up. The theory of the defense was, and there was testimony which tended that way, that he was kicking scales out from under the cogs, and that when the table was lowered it caught his foot. We are not concerned what the fact may be, because it is on other bases that the cause must be reversed.
One of the principal contentions of the appellant is that there is a variance, pronounced, irreconcilable and fatal, between the allegations of the complaint and the proof which the plaintiff offered. It is insisted that even under our code there has been no such wide departure from the rules by which parties are governed as to permit the plaintiff to allege one state of facts as his cause of action and recover on proof of another. As a general proposition this is undoubtedly true, though the old rule is not so strictly enforced under our code as it was at the common law and is still in some *547 states. In fact, it may perhaps he truthfully said of it, as Cicero said of ' Catiline, “ ahiit excessit evasit erupit.” It undoubtedly still prevails, and the only difficulty is in the inquiry whether the particular case requires its enforcement. It is illustrated in many cases. York v. Fortenbury, 15 Colo. 129; First Nat. Bank v. Devenish, 15 Colo. 229; Greer v. Heiser, 16 Colo. 306; Salazar v. Taylor, 18 Colo. 538; Hallack v. Hinckley, 19 Colo. 38; McLaughlin v. Thompson, 2 Colo. App. 135; R. G. Western Ry. Co. v. Rubenstein, 5 Colo. App. 121; D. & R. G. Ry. Co. v. Cahill, ante, p. 158.
Under our liberal practice, the pleadings and proof must correspond. A disregard of this principle will defeat the plaintiff, unless the case be brought within the tolerably well recognized exception. Wherever the evidence which tends to make a case other than that laid in the complaint is received without objection, and the defendant has not been surprised, the judgment will not always be overturned. The difficulty may be met by a motion to amend the pleadings, or such procedure to correct the error followed as the authorities and the code permit, and the plaintiff thereby avert the ultimate defeat which he could not have escaped at the common law. This case would not be reversed on this account but for the difficulty which arises from the instructions. According to the complaint, Cummings was ordered to turn the valve to start the water running. He was ordered to do this specific thing, and by a man who was authorized to give the order, and in its execution he got hurt because of the defective machinery operated by the company. All these elements were essential parts of his cause of action as stated. If he was not ordered to turn on the valve, then getting onto the machinery was negligence on his part, and he could not recover, unless he departed from the cause of action as stated. In the latter case he must prove that he got onto the table in the performance of a duty which he was obligated to perform, and which he had a right to execute as his judgment should dictate, and that at the time of his attempted performance his duty required him to turn the valve and let on the water. *548 Possibly, if he had proved the latter case, he might recover notwithstanding the variance. One of the other of these conditions must have existed: he must either have been ordered to do that particular thing, or he must have attempted to do it in the performance of some duty then resting upon him and which it was necessary for him to discharge at the time he did it. Failing in either, he cannot recover. He did not attempt to show it was necessary to turn the valve at the time he did in the performance of any duty which he was obligated to perform. Therefore he was compelled to fall back on the cause of action as stated in the complaint, to wit, the. giving of an order. This he denied. Thereupon, on the conclusion of the case, the defendant asked an instruction substantially reciting the allegations of the complaint and telling the jury that if they believed the plaintiff was not ordered to turn on the water they must return a verdict for the defendant. The company was entitled to this instruction, barring proof which was not given. According to the case as the plaintiff made it and as it was supported by the uncontradicted testimonj7 of the witnesses for the defense, Cummings had no right to attempt to get on the table and open the valve without first notifying the m e form an of his intentions. Otherwise he took a risk which he had no right to take, and so far as the case now stands this contributed to the injury. This, without other proof, would bar his recovery.
Another proposition which is equally fatal to the judgment springs from a modification of an instruction asked by the company with reference to the presumption that the servant assumed the risk of the defective machinery in the absence of a complaint on his part about it and a promise by the employer to remedy the defect complained of. The instruction which the defendant company asked was given with a modification. The modification substantially recited that if the jury should find the plaintiff had been informed by persons in control or having the custody of the machinery that the defects had been remedied, and, relying on the statements and believing the machinery to be in good condition, he *549 remained, he could still recover. This cannot be the law. In the first place, it is not put in the form which the cases recognize and according to the rule which has been laid down in this state. In Burlington R. R. Co. v. Liehe, 17 Colo. 280, the present learned chief justice of the supreme court states the rule which is supported by the modern authorities. The servant is conclusively assumed to waive his right to hold the company responsible, and to take the risk on himself, unless he shows that he objected to the use of the machinery of which he complained and remained in the employ of the defendant because of a promise to remedy the defect. This is the law, and the instruction asked stated it in the language of that authority. Whether the modification would ever be the law would of course depend on the particular circumstances of the case where it was sought to be applied. It was totally inapplicable to the proofs. Ellsworth did not undertake to say that the machinery had been remedied or repaired, nor was the statement made after a complaint by the employé,nor can it be taken as a promise by the employer to correct what the workman complained of. Ellsworth was not the employer. It was not shown that he was in a position or bore any relation to the company which entitled him to make a promise to the plaintiff or any statement on which the plaintiff had a right to rely, nor was it shown that the statements were made after the workman had made any complaint of the defective lights. The case lacks all the elements and all the proof which warranted the modification. It is very evident to one accustomed to the trial of this class of cases before juries that it furnished a very substantial basis on which the jury might act and escape the force and effect of the antecedent accurate statement of the law, that if a workman continued in the service with knowledge that the machinery was defective, he could not complain of an injury received because of it, but was conclusively presumed to have accepted the risk himself. It must have operated to the prejudice of the company,.and should not have been added to the instruction asked.
*550 There are many other errors complained of, but none of sufficient consequence to compel us to notice them, or of the kind likely to reoccur on the subsequent trial of the case, except one, which we will proceed now to notice.
While the proof is not entirely satisfactory respecting all of the details which we state, since no one was called witli reference to the subject, except the surgeon, whose knowledge was indefinite and uncertain and largely hearsay, we find the question raised and sufficiently presented to compel a decision. Our statement is gathered from the doctor’s testimony, and may have accorded literally with the facts, or they may not be exactly accurate, but as we have no other source of information we state them as we get them. The C. C. & I. Co., as the appellant used to be known, and the D. & R. G. Ry. Co., established a hospital in Pueblo for the use of both companies. This hospital was supported by contributions more or less voluntary or compulsory from the employés of both corporations, out of whose monthly wages a certain sum was deducted for what was called a “hospital fund,” and devoted to the maintenance of the building, the purchase of supplies for it, and the hire of physicians and nurses who were employed about it. The companies were apparently responsible for the hospital and for all bills which were contracted in connection with it, whether for supplies, attendance, or medical service, though the funds which they used may all or partially or otherwise have come from these monthly contributions. Whatever the fact may be, the doctor who was employed by the company and received his salary from them under these circumstances attended Cummings after he was hurt. lie was put on the stand and interrogated respecting his observation of the foot and respecting his opinion about the manner in which it was hurt. This was evidently in support of the defendant’s theory that Cummings was not hurt while climbing onto the table to turn the valve, but got his foot underneath the table in kicking out the scales, as one witness testified he had stated to him directly thereafter, and got his foot caught when the motormau was *551 lowering the table. The importance of this evidence is quite apparent on any theory which the plaintiff had advanced, for if the doctor should testify that, according to his examination, the hurt came by a pressure from above and not by the interlocking of cogs, it would support the contention that the injury was received while kicking scales. The testimony was excluded and the appellant strenuously insists the ruling was erroneous.
According to the better authorities, the testimony is inadmissible if the relation of physician and patient existed. Our statute (General Statutes, section 3649) prohibits the examination of a physician or surgeon without the consent of his patient as to any information which he may have acquired by attending him. This provision is as broad as the statute of any state to which our attention has been called. As we view the case, and as we believe the law to be, the inhibition is broad enough to exclude an examination of the surgeon as to any information which he has acquired while attending a patient, whether this information is deduced from statements or gathered from his professional or surgical examination. It is a common knowledge that the eye and finger of the attending surgeon is vastly more expert in locating cause or trouble than the tongue of the most astute patient. The authorities hold that no matter how the information may be acquired, whether it comes to the surgeon in the shape of oral statements, or by reason of his examination, he cannot be interrogated respecting it. Freel v. Market St. Cable Ry. Co., 97 Cal. 40; Gartside v. The Conn. Mut. Life Ins. Co., 76 Mo. 446; Briggs v. Briggs, 20 Mich. 34; Dilleber v. Home Life Ins. Co., 69 N. Y. 256; Masonic Mut. Ben. Assn. v. Beck, 77 Ind. 203.
This leaves only the question whether the relation of physician and patient existed. It is a narrow inquiry, and one possibly a little difficult of satisfactory solution. We are, however, entirely satisfied that the circumstances under which the doctor was employed and the relation existing between the company and its employés and the doctor, were *552 such as to put the physician and the plaintiff directly in the relation of doctor and patient. The plaintiff’s contributions may have been slight, but the circumstances of the situation were such as to lead him to put himself implicitly under the care of the surgeon and to trust himself in his hands for care to the same extent and under the same circumstances as though he had sent out for another physician and put himself directly in his charge. Unless something more can be shown than the present case discloses, we are compelled to hold the evidence properly excluded.
This disposes of all the errors which require attention, and since the jury were not properly instructed we must reverse the case. We have been asked by the appellant to enter judgment on the record. We do not concede this to be our duty, and we gravely doubt our right in a case of this description to enter a judgment of that sort. We should thereby turn ourselves into a tribunal for the trial of questions of fact and usurp the place of the jury, whose sole function it is to pass on such questions. What the subsequent trial may disclose it is impossible for us to foresee, and while the appellant is entitled to a new trial by reason of the errors which the trial court committed, the appellee is equally entitled to submit his case to another jury, which, when properly instructed with reference to the law, may determine the issue between the workman and the company.
The judgment is reversed.

Reversed.