## ANNIE BOOREN v. GEORGE E. McWILLIAMS.

(145 N. W. 410.)

**Breach of promise of marriage — statement of plaintiff to her physician — contrary to her testimony on trial — privileged communications — evidence — offer of proof by defendant — remarks by the court — prejudicial.**

1. In an action for breach of promise of marriage, defendant offered to show by a physician a conversation with the plaintiff on the occasion of a visit to her subsequent to her confinement, which conversation, if testified to, would show statements of plaintiff in direct conflict with her claims in this litigation. During the proceedings to determine whether the testimony of the doctor was privileged under the statute, the court, in addressing counsel, said in part: "If a man can act as a doctor just as has been testified to here, if he can act as a doctor and make a call, and then, when called again, repudiate the professional part of it and become something else, if he can do that in a case of this kind, he can go out and separate his visits into two calls. He can make the call professionally and act as a detective right straight through. We have a good and wholesome statute on that, and if this kind of business can prevail, there is nothing in it, and it is wiped out and torn to pieces." The offer of proof which called forth this declaration was to show statements made by plaintiff when it was claimed the witness was not attending her in a professional capacity. It is *held* under these facts and all the surrounding circumstances, that this statement by the court was unwarranted, and in a case where the evidence of the parties as to the direct issues was practically uncorroborated and in direct conflict, and a slight thing might influence the verdict, was prejudicial.

---

Note. — For a collection of the authorities on the measure of damages for breach of promise to marry, see note in 41 L.R.A.(N.S.) 840.

On the question of the right to prove seduction in aggravation of damages in breach of promise case, see notes in 4 L.R.A.(N.S.) 616, and 36 L.R.A.(N.S.) 388. And as to the necessity of averring seduction in order to recover therefor in an action for breach of promise, see note in 33 L.R.A.(N.S.) 702. See also note in 26 Am. Dec. 677.

**Errors — fair trial.**

2. Many minor errors disclosed in the record, all unfavorable to the defendant, considered in connection with the whole record, indicate that he did not have a fair trial.

**Physician — testimony — consent of patient — object of the statute.**

3. Section 7304, Rev. Codes 1905, prohibits a physician being examined as a witness, without the consent of his patient, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient. *Held*, that the object of this statute is to inspire confidence in the patient and encourage him to make a full disclosure to the physician of his symptoms and condition, by protecting against physicians making known to the curious the ailments of their patients, particularly when afflicted with diseases which might bring reproach, criticism, unfriendly comment, or disgrace upon the patient, if known to exist.

**Evidence — privileged communications — physicians — burden of proof — defendant.**

4. When a party to litigation seeks to exclude the testimony of a physician on the ground that it is privileged under the above statute, the burden is upon such party to bring or show the evidence to be within the terms of the statute granting the privilege.

**Question of the privileged character of evidence for the court — circumstances — opinion of physician — belief of patient.**

5. The question of the privileged character of the testimony is for the court, taking into consideration all the circumstances, and, if necessary, the opinion of the physician and the belief of the patient.

**Privileged communications — necessary facts to show — information acquired while attending patient — necessary to enable him to prescribe.**

6. Two facts must combine to render the testimony of a physician privileged under the provisions of § 7304, Rev. Codes 1905, namely, he must have acquired the information while attending the patient in his professional capacity, and the information must also have been necessary to enable him to prescribe or act for the patient. *Held*, under the facts of this case, that the testimony sought to be elicited from the physician was not privileged, as it is clear that the questions did not call for information necessary to enable the physician to prescribe or act for her.

**Offer of proof — confinement — information given by plaintiff to attending physician — unprivileged.**

7. An offer was made to prove that the physician who attended plaintiff during confinement, on a subsequent visit to her, was told by plaintiff that she did not have intercourse with defendant until after the 4th of July, or about six and one-half months prior to the birth of a child; that she never had any talk with defendant about marriage, and that the reason she let him have inter-

course with her was that she thought, if she became pregnant, he would marry her. *Held*, that, under the circumstances surrounding the visit, it is apparent that such information, if given the physician, was not necessary to enable him to prescribe or act for the plaintiff, and that therefore it was not privileged under the statute.

**Breach of promise of marriage — seduction — aggravation of damages — physical suffering at birth of child — proper.**

8. In an action for breach of promise of marriage, in which seduction is a proper element in aggravation of damages, the physical suffering occasioned by the birth of a child resulting from the seduction may be considered in determining the damages.

**Instructions to jury — damages — prejudice.**

9. An instruction to a jury that it might take into consideration all the other facts and circumstances in the case in assessing damages is too broad; but in this case cannot be said to have been prejudicial.

**Evidence — rulings of court — error.**

10. Certain rulings of the court on the admission and exclusion of evidence examined, and *held* erroneous.

**Contract of marriage — implied promise — issues — jury.**

11. Without setting forth the evidence on the subject of a contract of marriage, it is *held* that the record in this case discloses sufficient evidence tending to show an implied agreement to marry, to warrant submitting the issues to the jury.

Opinion filed January 14, 1914.

Appeal from a judgment of the District Court of Towner County for plaintiff, and from an order denying a new trial, Hon. *J. F. Cowan*, J. Reversed.

*P. J. McClory* and *Bangs, Cooley, & Hamilton*, for appellant.

At common law there was no immunity granted a physician from testifying fully as to conversations had with his patients, but the laws of this state have exempted or prohibited physicians from testifying as to information acquired from his patient while in attendance, and which is necessary to enable the physician to properly prescribe. Rev. Codes 1905, § 7304; Wigmore, Ev. § 2380; Greenl. Ev. 16th ed. § 247a.

Upon the question of whether or not the information gained by a physician from his patient while in attendance upon such patient was *necessary* to enable the physician to prescribe, the *court* is just as well qualified to pass as is or was the physician, or to consider the nature

and character of such information. Madsen v. Utah Light & R. Co. 36 Utah, 528, 105 Pac. 801.

To entitle a party to the privilege extended by our statute, it is necessary that the information be acquired by the physician while he is attending the patient in a professional capacity. Edington v. Ætna L. Ins. Co. 77 N. Y. 564; People v. Austin, 199 N. Y. 446, 93 N. E. 57.

The burden of showing that the evidence sought to be excluded under this statute is privileged is upon the party who seeks to exclude it. Chicago, I. & L. R. Co. v. Gorman, 47 Ind. App. 432, 94 N. E. 730; People v. Koerner, 154 N. Y. 355, 48 N. E. 730; People v. Schuyler, 106 N. Y. 298, 12 N. E. 783; Smits v. State, 145 Wis. 601, 130 N. W. 525; Campau v. North, 39 Mich. 606, 33 Am. Rep. 433; Lincoln v. Detroit, 101 Mich. 245, 59 N. W. 617; Edington v. Ætna L. Ins. Co. supra; Green v. Metropolitan Street R. Co. 171 N. Y. 201, 89 Am. St. Rep. 807, 63 N. E. 958; Griffiths v. Metropolitan Street R. Co. 171 N. Y. 106, 63 N. E. 808, 11 Am. Neg. Rep. 620, 63 App. Div. 86, 71 N. Y. Supp. 406; People v. Austin, supra; Travis v. Haan, 119 App. Div. 138, 103 N. Y. Supp. 973; Dejong v. Erie R. Co. 43 App. Div. 427, 60 N. Y. Supp. 125; Griebel v. Brooklyn Heights R. Co. 68 App. Div. 204, 74 N. Y. Supp. 126; Benjamin v. Tupper Lake, 110 App. Div. 426, 97 N. Y. Supp. 512.; Cooley v. Foltz, 85 Mich. 47, 48 N. W. 176; People v. Cole, 113 Mich. 83, 71 N. W. 455; Green v. Terminal R. Asso. 211 Mo. 18, 109 S. W. 715; Kansas City, Ft. S. & M. R. Co. v. Murray, 55 Kan. 336, 40 Pac. 646; Smith v. John L. Roper Lumber Co. 147 N. C. 62, 125 Am. St. Rep. 535, 60 S. E. 717, 15 Ann. Cas. 580; Missouri P. R. Co. v. Castle, 97 C. C. A. 124, 172 Fed. 841; Madsen v. Utah Light & R. Co. 36 Utah, 528, 105 Pac. 799; Collins v. Mack, 31 Ark. 684; Re Bruendl, 102 Wis. 45, 78 N. W. 169; Heuston v. Simpson, 115 Ind. 62, 7 Am. St. Rep. 409, 17 N. E. 261; Pennsylvania Co. v. Marion, 123 Ind. 415, 7 L.R.A. 687, 18 Am. St. Rep. 330, 23 N. E. 973, 3 Am. Neg. Cas. 261; New York & St. L. R. Co. v. Mushrush, 11 Ind. App. 192, 37 N. E. 954, 38 N. E. 871; Penn Mut. L. Ins. Co. v. Wiler, 100 Ind. 92, 50 Am. Rep. 769; Raymond v. Burlington C. R. & N. R. Co. 65 Iowa, 152, 21 N. W. 495, 3 Am. Neg. Cas. 365; Keist v. Chicago G. W. R. Co. 110 Iowa, 32, 81 N. W. 181; Battis v. Chicago, R. I. & P. R. Co. 124

Iowa, 623, 100 N. W. 543; Munz v. Salt Lake City R. Co. 25 Utah, 220, 70 Pac. 852, 13 Am. Neg. Rep. 214; May v. Northern P. R. Co. 32 Mont. 522, 70 L.R.A. 111, 81 Pac. 328, 4 Ann. Cas. 605; Patterson v. Cole, 67 Kan. 441, 73 Pac. 54, 14 Am. Neg. Rep. 543; McRae v. Erickson, 1 Cal. App. 326, 82 Pac. 209; Colorado Fuel & Iron Co. v. Cummings, 8 Colo. App. 541, 46 Pac. 875.

The instruction of the court to the jury that damages could be assessed for mental suffering, and also by reason of the fact that she became pregnant, and that a child was born, was error. Giese v. Shultz, 53 Wis. 462, 10 N. W. 598; Musselman v. Barker, 26 Neb. 737, 42 N. W. 759; Tyler v. Salley, 82 Me. 128, 19 Atl. 107.

The consent of the woman by deceit or artifice is an essential and necessary element, and must be shown, to establish the fact of seduction. Lee v. Hefley, 21 Ind. 98; Bradshaw v. Jones, 103 Tenn. 331, 76 Am. St. Rep. 655, 52 S. W. 1072; White v. Murtland, 71 Ill. 250, 22 Am. Rep. 100; Marshall v. Taylor, 98 Cal. 55, 35 Am. St. Rep. 144, 32 Pac. 867; Baird v. Boehner, 72 Iowa, 318, 33 N. W. 694; Gover v. Dill, 3 Iowa, 337; Brown v. Kingsley, 38 Iowa, 220; Parker v. Monteith, 7 Or. 277; Patterson v. Hayden, 17 Or. 238, 3 L.R.A. 529, 11 Am. St. Rep. 822, 21 Pac. 129; Breon v. Henkle, 14 Or. 494, 13 Pac. 289.

An instruction that submits to the jury to find whether or not a certain fact exists, when there is no evidence to *prove* such fact, is misleading and erroneous. Clement v. Boone, 5 Ill. App. 109; American Transp. Co. v. Moore, 5 Mich. 368; State Bank v. Hubbard, 8 Ark. 183.

The burden of proving why she submitted to having sexual intercourse with defendant is, in such cases, upon the plaintiff. The promise of marriage must be the moving cause, to show seduction. Cooper v. State, 90 Ala. 641, 8 So. 821; People v. Wallace, 109 Cal. 611, 42 Pac. 159; Phillips v. State, 108 Ind. 406, 9 N. E. 345; People v. Hubbard, 92 Mich. 322, 52 N. W. 729.

Questions referring to plaintiff's intimacy with other men are proper in such cases. State v. McKnight, 7 N. D. 450, 75 N. W. 790.

A witness may testify as to the conduct, demeanor, or manner. of another. 5 Enc. Ev. 674; M'Kee v. Nelson, 4 Cow. 355, 15 Am. Dec. 384; Beans v. Denny, 141 Iowa, 52, 117 N. W. 1091; Lewis v. Mason,

109 Mass. 169; Travelers' Ins. Co. v. Sheppard, 85 Ga. 751, 12 S. E. 18.

It is highly proper to examine a party as to statements made out of court inconsistent with her testimony given in the trial. Hall v. Chicago, R. I. & P. R. Co. 84 Iowa, 311, 51 N. W. 150.

There is nothing in this case to show. even an *implied* promise of marriage. Button v. Hibbard, 82 Hun, 289, 64 N. Y. S. R. 80, 31 N. Y. Supp. 483.

Mere attentions, although exclusive and long continued, are not enough to show a *promise* of marriage. Walker v. Johnson, 6 Ind. App. 600, 33 N. E. 267, 34 N. E. 100; Espy v. Jones, 37 Ala. 379; Walmsley v. Robinson, 63 Ill. 41, 41 Am. Rep. 111; Burnham v. Cornwell, 16 B. Mon. 284, 63 Am. Dec. 529; Standiford v. Gentry, 32 Mo. 477; Weaver v. Bachert, 2 Pa. St. 80, 44 Am. Dec. 159; Yale v. Curtiss, 151 N. Y. 598, 45 N. E. 1125; Munson v. Hastings, 12 Vt. 346, 36 Am. Dec. 345.

*F. T. Cuthbert, A. R. Smythe, L. H. Sennett,* and *John J. Kehoe,* for respondent.

Our statute, § 7304, Revised Codes 1905, no doubt was intended to protect not only the attending physician, but the patient as well, in the same manner and under the same wholesome rule that prevailed under the common law in reference to attorneys and clients. Burgess v. Sims Drug Co. 114 Iowa, 275, 54 L.R.A. 364, 89 Am. St. Rep. 359, 86 N. W. 307, 10 Am. Neg. Rep. 42.

The statute should be given a liberal construction, in order that its purposes may be fully accomplished, and not only the physician, but the patient, protected. McRae v. Erickson, 1 Cal. App. 326, 82 Pac. 209; Edington v. Mutual L. Ins. Co. 67 N. Y. 185; Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 281, 36 Am. Rep. 617; Munz v. Salt Lake City R. Co. 25 Utah, 220, 70 Pac. 852, 13 Am. Neg. Rep. 214; Madsen v. Utah Light & R. Co. 36 Utah, 528, 105 Pac. 799; State v. Kennedy, 177 Mo. 98, 75 S. W. 987; Thomas v. Byron Twp. 168 Mich. 593, 78 L.R.A.(N.S.) 1186, 134 N. W. 1021, Ann. Cas. 1913C, 686; Patterson v. Cole, 67 Kan. 441, 73 Pac. 54, 14 Am. Neg. Rep. 543; Burgess v. Sims Drug Co. supra; Battis v. Chicago, R. I. & P. R. Co. 124 Iowa, 623, 100 N. W. 543; Colorado Fuel & Iron Co. v. Cum-

mings, 8 Colo. App. 541, 46 Pac. 875; Colo. Gen. Stat. § 3649 is § 4824 of 2 Mills' Anno. Stat.

It is true that the burden is on the party seeking to suppress the evidence, to show that it is within the terms of the statute. But the establishing of the relation of physician and patient during the time the physician acquired the information from the patient is sufficient, and gives rise to the presumption that the physician acquired the information to enable him to properly act and prescribe for the patient. Edington v. Mutual L. Ins. Co. 67 N. Y. 185; Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 281, 36 Am. Rep. 617; Munz v. Salt Lake City R. Co. 25 Utah, 220, 70 Pac. 852, 13 Am. Neg. Rep. 214; Madsen v. Utah Light & R. Co. 36 Utah, 528, 105 Pac. 799; State v. Kennedy, 177 Mo. 98, 75 S. W. 987; Re Redfield, 116 Cal. 637, 48 Pac. 794; Patterson v. Cole, 67 Kan. 441, 73 Pac. 54, 14 Am. Neg. Rep. 543; Colorado Fuel & Iron Co. v. Cummings, 8 Colo. App. 541, 46 Pac. 875; Battis v. Chicago, R. I. & P. R. Co. 124 Iowa, 623, 100 N. W. 543; Thomas v. Byron Twp. 168 Mich. 593, 38 L.R.A.(N.S.) 1136, 134 N. W. 1021, Ann. Cas. 1913C, 686.

The information obtained from the plaintiff by the doctor while he was attending her was and is privileged to the plaintiff. Edington v. Mutual L. Ins. Co. 67 N. Y. 185; Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 281, 36 Am. Rep. 617; Re Darragh, 52 Hun, 591, 5 N. Y. Supp. 58; Freel v. Market Street Cable R. Co. 97 Cal. 40, 31·Pac. 730; McRae v. Erickson, 1 Cal. App. 326, 82 Pac. 209; Battis v. Chicago, R. I. & P. R. Co. 124 Iowa, 623, 100 N. W. 543; Green v. Nebagamain, 113 Wis. 508, 89 N. W. 520; Patterson v. Cole, 67 Kan. 441, 73 N. W. 54, 14 Am. Neg. Rep. 543; Colorado Fuel & Iron Co. v. Cummings, 8 Colo. App. 541, 46 Pac. 875; Heuston v. Simpson, 115 Ind. 62, 7 Am. St. Rep. 409, 17 N. E. 261; Pennsylvania Co. v. Marion, 123 Ind. 415, 7 L.R.A. 687, 18 Am. St. Rep. 330, 23 N. E. 973, 3 Am. Neg. Cas. 261; Munz v. Salt Lake City R. Co. 25 Utah, 220, 70 Pac. 852, 13 Am. Neg. Rep. 214.

The plaintiff did not waive her rights under such statute when and because she offered herself as a witness. May v. Northern P. R. Co. 32 Mont. 522, 70 L.R.A. 111, 81 Pac. 328, 4 Ann. Cas. 605; Neolle v. Hoquiam Lumber & Shingle Co. 47 Wash. 519, 92 Pac. 372; Burgess v. Sims Drug Co. 114 Iowa, 275, 54 L.R.A. 364, 89 Am. St. Rep. 359,

86 N. W. 307, 10 Am. Neg. Rep. 42; Hilary v. Minneapolis Street R. Co. 104 Minn. 432, 116 N. W. 933; Green v. Nebagamain, 113 Wis. 508, 89 N. W. 520; Williams v. Johnson, 112 Ind. 273, 13 N. E. 872; McConnell v. Osage, 80 Iowa, 293, 8 L.R.A. 778, 45 N. W. 550.

And plaintiff did not waive such rights by answering questions on her cross-examination as to a matter of privilege between herself and the doctor. She still had the right to object to the doctor testifying touching such matter. Burgess v. Sims Drug Co. 114 Iowa, 275, 54 L.R.A. 364, 89 Am. St. Rep. 359, 86 N. W. 307, 10 Am. Neg. Rep. 42; Larson v. State, 92 Neb. 24, 137 N. W. 894; Lauer v. Banning, 152 Iowa, 99, 131 N. W. 783.

That which is privileged to the patient is *any information* acquired by the attending physician which is necessary for him to act or prescribe for his patient. 2 Cyc. 136; Boyle v. Northwestern Mut. Relief Asso. 95 Wis. 312, 70 N. W. 351; Auld v. Cathro, 20 N. D. 461, 32 L.R.A.(N.S.) 71, 128 N. W. 1025, Ann. Cas. 1913A, 90.

Misconduct of an attorney in examining a witness is always a proper subject for the trial court to control. Abbott, Civil Jury Trials, 3d ed. p. 477; Whitney v. Swensen, 43 Minn. 337, 45 N. W. 609; Krapp v. Hauer, 38 Kan. 430, 16 Pac. 702; Tuller v. Ginsburg, 99 Mich. 137, 57 N. W. 1099.

Witnesses should answer proper questions promptly, politely, and without evasion, and this matter is properly within the control of the trial court, who not only sees the witnesses, but has full opportunity to correctly judge them and their actions. Clark v. Field, 42 Mich. 342, 4 N. W. 19.

It is not reversible error to refuse requested instructions, if the substance of such instructions is covered by the court on its general instructions. State v. Hayes, 23 S. D. 596, 122 N. W. 652; State v. Jackson, 21 S. D. 494, 113 N. W. 880, 16 Ann. Cas. 87; Waterhouse v. Jos. Schlitz Brewing Co. 16 S. D. 592, 94 N. W. 587; United States v. Adams, 2 Dak. 305, 9 N. W. 718; Young v. Harris, 4 Dak. 367, 32 N. W. 97; Territory v. Chartrand, 1 Dak. 379, 46 N. W. 583; Cheatham v. Wilbur, 1 Dak. 335, 46 N. W. 580.

Seduction is a proper element to consider in aggravation of damages for breach of promise of marriage, if properly predicated on such prom-

ise. Wrynn v. Downey, 27 R. I. 454, 4 L.R.A.(N.S.) 616, 114 Am. St. Rep. 63, 63 Atl. 401, 8 Ann. Cas. 912; Stokes v. Mason, 85 Vt. 164, 36 L.R.A.(N.S.) 388, 81 Atl. 162; Giese v. Schultz, 69 Wis. 521, 34 N. W. 913; Musselman v. Barker, 26 Neb. 737, 42 N. W. 759; Fleetford v. Barnett, 11 Colo. App. 77, 52 Pac. 293; Liese v. Meyer, 143 Mo. 547, 45 S. W. 282; McKinsey v. Squires, 32 W. Va. 41, 9 S. E. 55.

It is proper in such cases to offer evidence of the plaintiff's feelings and mortification resulting from the breach of the contract. Reed v. Clark, 47 Cal. 194; Royal v. Smith, 40 Iowa, 615; Coolidge v. Neat, 129 Mass. 146; Bennett v. Beam, 42 Mich. 346, 36 Am. Rep. 442, 4 N. W. 8; Goodal v. Thurman, 1 Head, 209; Vanderpool v. Richardson, 52 Mich. 336, 17 N. W. 936; Grant v. Willey, 101 Mass. 356.

The seduced female herself cannot be cross-examined as to her intercourse with other men. Neither can the witnesses. Such evidence does not go to prove or disprove the promise of marriage. Dodd v. Norris, 3 Camp. 519, 14 Revised Rep. 832; Shattuck v. Myers, 13 Ind. 46, 75 Am. Dec. 236; Smith v. Yaryan, 69 Ind. 445, 35 Am. Rep. 232; Hoffman v. Kemerer, 44 Pa. 452; Doyle v. Jessup, 29 Ill. 460; Vaughan v. Perine, 3 N. J. L. 728, 4 Am. Dec. 411.

The latitude of cross-examination is largely in the discretion of the trial court. State v. Foster, 14 N. D. 561, 105 N. W. 938; State v. Longstreth, 19 N. D. 268, 121 N. W. 1114, Ann. Cas. 1912D, 1317.

Where different minds might reach different conclusions on the same facts, the question is for the jury. Gordon v. Ashley, 191 N. Y. 193, 83 N. E. 686; Tousey v. Hastings, 194 N. Y. 82, 86 N. E. 831; Re Totten, 179 N. Y. 112, 70 L.R.A. 711, 71 N. E. 748, 1 Ann. Cas. 900.

While it is true that an acceptance of an offer of marriage must be shown, it need not be in or by words. It may be inferred by circumstances and by the conduct of the parties. Morgan v. Yarborough, 5 La. Ann. 316; Wells v. Padgett, 8 Barb. 323; Daniel v. Bowles, 2 Car. & P. 553; Wightman v. Coates, 15 Mass. 1, 8 Am. Dec. 77; Johnson v. Caulkins, 1 Johns. Cas. 116, 1 Am. Dec. 102; Green v. Spencer, 3 Mo. 318, 26 Am. Dec. 672; Bracken v. Dinning, 141 Ky. 265, 132 S. W. 425; Kennedy v. Rodgers, 2 Kan. App. 764, 44 Pac. 47; Johnson

v. Leggett, 28 Kan. 590; Homan v. Earle, 53 N. Y. 267; Blackburn v. Mann, 85 Ill. 222; Thurston v. Cavenor, 8 Iowa, 155; Coil v. Wallace, 24 N. J. L. 291; Chamness v. Cox, 131 Ind. 118, 30 N. E. 901.

Where there is substantial conflict in the evidence, and the jury has made its findings, appellate courts will not disturb the verdict. Caledonia Gold Min. Co. v. Noonan, 3 Dak. 189, 14 N. W. 426, 121 U. S. 393, 30 L. ed. 1061, 7 Sup. Ct. Rep. 911; State ex rel. Morrill v. Massey, 10 N. D. 154, 86 N. W. 225; Jasper v. Hazen, 4 N. D. 1, 23 L.R.A. 58, 58 N. W. 454; Nichols & S. Co. v. Stangler, 7 N. D. 109, 72 N. W. 1089; Axiom Min. Co. v. White, 10 S. D. 202, 72 N. W. 462; Casey v. First Bank, 20 N. D. 211, 126 N. W. 1011; Charles E. Bryant & Co. v. Arnold, 19 S. D. 106, 102 N. W. 303; Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225.

The verdict in this case as to the amount of damages is reasonable, and should not be disturbed. Lanigan v. Neely, 4 Cal. App. 760, 89 Pac. 441; Broyhill v. Norton, 175 Mo. 190, 74 S. W. 1024; Fisher v. Kenyon, 56 Wash. 8, 104 Pac. 1127, 20 Ann. Cas. 1264; Kennedy v. Rodgers, 2 Kan. App. 764, 44 Pac. 47; F. A. Patrick & Co. v. Austin, 20 N. D. 261, 127 N. W. 109; Lawver v. Globe Mut. Ins. Co. 25 S. D. 549, 127 N. W. 615; Nilson v. Horton, 19 N. D. 187, 123 N. W. 397; Acton v. Fargo & M. Street R. Co. 20 N. D. 434, 129 N. W. 225; Casey v. First Bank, 20 N. D. 211, 126 N. W. 1011.

Error, to be reversible, must be shown to have substantially and materially and unjustly affected the rights of the party asserting it. Whitney v. Brown, 75 Kan. 678, 11 L.R.A.(N.S.) 468, 90 Pac. 277, 12 Ann. Cas. 768; Mageau v. Great Northern R. Co. 103 Minn. 290, 15 L.R.A.(N.S.) 511, 115 N. W. 651, 14 Ann. Cas. 551; Johnson v. Walker, 86 Miss. 757, 1 L.R.A.(N.S.) 470, 109 Am. St. Rep. 733, 39 So. 49; Woods v. Lisbon, 138 Iowa, 402, 16 L.R.A.(N.S.) 887, 128 Am. St. Rep. 208, 116 N. W. 143; Grimestad v. Lofgren, 105 Minn. 286, 17 L.R.A.(N.S.) 990, 127 Am. St. Rep. 566, 117 N. W. 515; Kuhl v. Chamberlain, 140 Iowa, 546, 21 L.R.A.(N.S.) 766, 118 N. W. 776; Madson v. Rutten, 16 N. D. 281, 13 L.R.A.(N.S.) 554, 113 N. W. 872; McClain v. Lewiston Interstate Fair & Racing Asso. 17 Idaho, 63, 25 L.R.A.(N.S.) 691, 104 Pac. 1015, 20 Ann. Cas. 60; Shaw v. Lobe, 58 Wash. 219, 29 L.R.A.(N.S.) 335, 108 Pac. 450; Cetofonde v.

Camden Coke Co. 78 N. J. L. 662, 27 L.R.A.(N.S.) 1058, 75 Atl. 913; Miller v. Northern P. R. Co. 18 N. D. 19, 118 N. W. 344, 19 Ann. Cas. 1215.

SPALDING, Ch. J.  This is an action for damages for breach of promise of marriage aggravated by seduction.  The defendant is a bachelor forty-six or forty-seven years of age, and quite well to do, owning and residing on a farm in Towner county.  The plaintiff was a divorced woman and the mother of two children, who were not living with her at the time the incidents occurred which are the basis of this action.

She and the defendant were strangers.  She heard that he was in need of female help in his household, and applied to him for employment under her maiden name.  Her application resulted in her being employed as housekeeper.

It is not now necessary to relate the acts which occurred between the parties, which, according to plaintiff's version, resulted in illicit intercourse between them, and the birth of a child which died shortly after its birth.

The defendant denies *in toto* all illicit relations and any agreement to marry, and claims not to have known that she was pregnant until the time of her confinement.  On becoming ill, she asked him to call the doctor, which he accordingly did.  The doctor visited her in response to the call, and she was delivered of a child.  He visited her a second time and a third time.  After the plaintiff had shown facts and acts which she claimed constituted an engagement to marry, and the subsequent relations of the parties, the doctor who attended her during confinement was called as a witness by the defendant.  He testified that McWilliams, the defendant, called him over the telephone on the morning of the 22d of January, 1910; that he heard him say to someone that "the doctor wanted to know what is the matter with you;" that McWilliams replied to the doctor.  His reply was excluded on objection.  On this visit he was acting as her physician and nothing else, and a child was born to her at that time.  We pass over certain objections made to his testifying as to the child being full term or otherwise, and come at once to a question on which a majority of the members of this court, after a reargument granted and had, are agreed, and which compels a reversal.

The doctor testified that he visited the plaintiff on a third occasion in the month of January, 1910, about a week following his first visit to her. On that occasion he had a conversation with her of which he had a recollection. The doctor was examined by plaintiff for the purpose of laying the foundation for an objection, and testified that this conversation was not had under the same conditions and circumstances as previous conversations; that he was not there in the capacity of a physician or treating the patient at that time; that he went there by request through her sister over the telephone, and that he took it not to be in a professional capacity; that, on receiving the call through the sister to go there, he went and found plaintiff still in bed; that he did not talk to her about her physical condition, or how she was getting along; that he might have asked her how she felt; that this was about a week after his second visit; that he had been there in the capacity of a physician and taken charge of the patient during confinement; that on his second visit he discharged himself and told her that he would not come again unless she requested him to; that he did not believe she was sick when he was there; that she was in bed, but had recovered from confinement, and was not what we could call sick, but was apparently in perfect health and normal; that he did not make any examination of her physically, though he thought he asked her if she felt all right; that he did not talk to her about medicine or treatment or ask her about that at all; that, at that time, he had something else in mind other than a professional trip, and no one had agreed to compensate him for that trip; that he made it as an act of charity; that McWilliams had never requested him to go there; that the last talk he had had with plaintiff was that he would not call again unless sent for by her.

After these preliminaries, the defendant offered to prove by the witness that, about the 27th day of January, 1910, the witness had a conversation with plaintiff, wherein she told witness that the defendant had never promised to marry her, and that she and defendant had never talked of marriage. This offer was objected to on the ground that no foundation was laid; that it was incompetent, irrelevant, and immaterial; and for the reason that it was immaterial under the provisions of subdivision 3, § 7304, Rev. Codes 1905. This objection was

sustained and exception taken, whereupon offer of proof number 4 was made in writing.

This offer was to prove by the doctor that, on or about the 27th day of January, 1910, plaintiff and witness had a conversation, and that in it the plaintiff told witness that the defendant had never promised to marry her, and that thereupon witness asked her why she had allowed him to have intercourse with her, and that she replied that she had allowed him to have intercourse with her because she believed that, if he did get her in a family way, he would marry her, and that she further said that there had never been any talk of marriage between plaintiff and defendant.

At this point counsel for plaintiff addressed the court and said: "If the court please, this brings up to a critical proposition, rather a critical proposition, and personally I would like a little time to examine the construction of the statute; if a man can be called in the capacity of a physician, and then switch over and become a spotter, it seems to me there should be some law on it." The court replied: "Yes, I think that, myself," whereupon counsel for defendant stated that he desired to take an exception to remarks of counsel, and asked the court to caution the jury to pay no attention to them. To this, the court replied: "No, the jury will pay no attention to those remarks at all, but I do think that this is a very serious proposition in this case. If a man can act as a doctor just as has been testified to here, if he can act as a doctor and make a call, and then when called again repudiate the professional part of it and become something else, if he can do that in a case of this kind, he can go out and separate his visits into two calls. He can make the call professionally and act as a detective right straight through. We have a good and wholesome statute on that, and if this kind of business can prevail there is nothing in it, and it is wiped out and torn to pieces. The same would apply to attorneys, and no man would then be safe if that is what this statute means. No man can be safe in going to an attorney and telling him his story and telling him his case, because he could divide his inquiries into what was necessary for the case, and then pump him out of the other side and make use of it." An exception was taken and granted to the remarks of the court. Error is assigned thereon.

1. It needs no argument to bring out the fact that these remarks

by the court in the presence of the jury, although directed to counsel, were highly prejudicial to the defendant. We say this without at this time considering the question of the admissibility of statements claimed to have been made by plaintiff to the witness. The defendant was contending and attempting to show that statements made by the plaintiff to the witness, when not in attendance upon her in the capacity of a physician, were diametrically opposed to her claim upon the witness stand when seeking to recover from the defendant for a breach of promise of marriage, aggravated by seduction.

She had testified that the acts of sexual intercourse which resulted in her pregnancy occurred in the month of May, and that there was an engagement to marry. It was sought to show by the witness that she had told him that there never was any promise of marriage or any talk of marriage; that no intercourse occurred until after the 4th of July, a time much less than nine months prior to the birth of the child, and that she had had intercourse with the defendant, because she thought if she became pregnant, he would marry her.

It is self-evident that these statements, if made, would have a very marked bearing upon the weight to be given her testimony on the main facts of the case. The proceedings of counsel for defendant were regular and proper, that is to say, they were offers of evidence which counsel had a right to make, and they were submitted in a proper manner to call for the ruling of the court. Instead of overruling the offers made and granting an exception, the court made a speech, in effect charging the defendant or his counsel with attempting to impose upon the plaintiff by employing the physician to both attend her and act as a detective or spotter to secure evidence, by way of admissions and statements from the plaintiff, favorable to defendant, and which might defeat her in any attempt to secure damages from him. Such remarks reflected upon the integrity and good faith of the defendant and his counsel, and may well have had a marked influence upon the verdict.

The plaintiff testified to acts and statements between the parties which might be construed as constituting an agreement to marry, also as to acts of illicit intercourse. The defendant denied positively any direct or implied agreement to marry, as well as any improper relations with the plaintiff. The testimony of neither party was corroborated to any considerable extent. The language used, if the testimony of the plain-

tiff was true, and relied upon as constituting the agreement to marry, was susceptible of more than one interpretation.  The defendant had never introduced her to his relatives or acquaintances as his promised wife; had never given her a ring or made her presents, or spoken of her in the presence of others as his future wife.  She had never informed others that she had promised to be his wife, or contemplated assuming that relation to him.  In this state of the record, it is apparent that evidence of but slight weight improperly excluded, if received, might change the verdict.

In this state of affairs, the court addresses remarks which, as we have said, seriously and unnecessarily reflect upon the integrity and the motives of the defense made by McWilliams.  A case might be imagined in which the testimony was nearly all one way and clearly showed an agreement to marry and other incidental facts, where such remarks might be held nonprejudicial, but in this case no such conditions existed when the offers were made or during the trial.  Furthermore, that they were prejudicial is pretty clearly disclosed by comparison of the testimony of the witness given prior to these remarks, and his testimony as continued after he had heard them as addressed to counsel.  We have set out enough to show that he clearly testified before this attack of the court, that, on the third occasion, he was not visiting the plaintiff in his professional capacity; that he did not prescribe for her, nor investigate her condition with the view of prescribing for her, or do anything along those lines other than to make the conventional inquiry as to how she felt; that he did not understand that he was there in his capacity as physician.

Immediately after the remarks made by the court, he testified that he could not believe but what he was called in a professional capacity, and, after giving some details, that the conversation he had there with her was in connection with his professional call, and, partly at the suggestion of the court, he testified that any information he received at that time was acquired while he was attending the patient and asking questions concerning her health, which would be necessary for him to prescribe for her if he found she needed it.

The language used by the court was very strong and catchy.  It might lead one to infer that the defendant had expressly employed the doctor to act as a detective and serve him in that capacity.  No evi-

dence is disclosed having any tendency to support any inference or statement of that nature. This examination of the witness was preliminary to his offered testimony, and made to determine whether the testimony offered was privileged, and in so far as the doctor's opinion on the subject had a bearing, it is obvious that the change of front was detrimental to the defendant. It was the duty of the court to, as far as possible, secure an unbiased statement from the physician as to his relations to the plaintiff on the occasion of the third visit. It may be that the latter part of his testimony was influenced by the language employed by the court, and, regardless of the effect of the language employed and the attitude of the court upon the jury, it may have influenced the testimony of the witness prejudicially to defendant. Counsel might by cross-examination have discredited the witness, but at that stage of the examination, and in that manner, it was not for the court to do so. People v. Fielding, 158 N. Y. 542, 46 L.R.A. 641, 70 Am. St. Rep. 495, 53 N. E. 497, 11 Am. Crim. Rep. 88; Edwards v. Mt. Hood Constr. Co. 64 Or. 308, 130 Pac. 49.

In the Fielding Case, the court says: "In a case that is free from doubt upon the merits, the appellate courts disregard errors of the trial court, even in a criminal case, when it is reasonably certain that they could not have affected the result. A proposition is reasonably certain when it is supported by the strong probabilities, but here, the strong probabilities are that the errors did affect the result. The average man cannot read the eloquent but inflammatory language of the district attorney without being impressed by it, and it is safe to presume that the effect would be heightened by hearing those words spoken with animation and enthusiasm under the exciting circumstances surrounding an important criminal trial. The jury might be told by the court to forget them, but could they forget them? They might be told to disregard them, but how can we be certain that they did disregard them?"

The above language applied to remarks by a prosecuting attorney. If the remarks of the prosecuting attorney in addressing the jury may be prejudicial to a party, how much more so will inflammatory remarks of the court be? Every attorney of experience knows that, as a rule, the jurors watch the court for the slightest intimation as to its opinion as to the merits of the action, not only for remarks, but as to the in-

flection of the voice, the countenance, gestures, and the general attitude and bearing toward the parties.

In the Edwards Case, the court says: "The writer knows from experience on the circuit bench that it is sometimes very difficult for a judge to refrain from making comments on a case during the progress of the trial, and especially where an apparent injustice seems to have been perpetrated; but, after a reversal or two occasioned by this practice, he concluded to go not to the ant, but to the meek and lowly oyster, to 'consider its ways and be wise,' and to keep the judicial mouth shut."

2. In this connection, it may be observed that the record discloses many minor errors which we shall not take up separately or further, but all of which were unfavorable to the defendant, and which come very near, when considered in connection with the whole record, disclosing an attitude of the court unfavorable to the defendant, and which it seems to this court must have been clearly apparent to the jury throughout the trial.

We do not say that any one of these minor errors was sufficient to justify a reversal, but we do think they go a long way toward showing that the defendant did not have a fair trial. See Willoughby v. Smith, — N. D. —, 144 N. W. 79; People v. Fielding, 158 N. Y. 542, 550, 46 L.R.A. 641, 70 Am. St. Rep. 495, 53 N. E. 497, 11 Am. Crim. Rep. 88; Quanah, A. &. P. R. Co. v. Galloway, — Tex. Civ. App. —, 154 S. W. 653.

3. Having concluded that the judgment in this case must be reversed, it will be unnecessary for us to pass upon other assignments of error, except for the guidance of the court on a new trial. For this reason, we take up the assignments of such questions as are likely to arise on another trial.

The most important question in the case relates to the admissibility of testimony offered to show, by Dr. Roberts, that the plaintiff stated to him on the occasion of the third visit, to which we have referred, that the defendant had never promised to marry her, nor had any talk with her on the subject, and that she permitted him to have intercourse with her in the belief that, if she became pregnant, he would marry her, and that no intercourse occurred until after the 4th of July, 1909. The exclusion of evidence of these statements requires a consideration of

§ 7304, Rev. Codes 1905, which, as far as material, is as follows: "A person cannot be examined as a witness in the following cases: . . . A physician or surgeon cannot, without the consent of his patient, be examined as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient. . . . "

It is in effect contended by respondent that ¶ 3, § 7304, supra, inhibits the physician from testifying as to any conversation had with a patient while in attendance as a physician, or as to any facts learned while so engaged, regardless of their being necessary to enable the physician to prescribe or act for the patient.

By appellant it is urged that on the occasion of the third visit of Dr. Roberts, so far as disclosed by the record, he was not attending as her physician, and, further, that in cases he was so in attendance upon her, the statements offered as made by the plaintiff to him were not within the prohibition of the statute, for the reason that they were not necessary to enable him to prescribe or act for her as her physician.

At common law, an attorney was not permitted to testify as to communications made by his client or knowledge acquired during consultations, but no such privilege was extended to physicians and patients. As to them, the privilege is purely statutory, and was intended to inspire confidence in the patient and encourage him in making a full disclosure to the physician as to his symptoms and condition, by preventing physicians from making known to the curious the ailments of their patients, particularly when afflicted with diseases which might bring reproach, criticism, unfriendly comment, or disgrace upon the patient, if known to exist. Capron v. Douglass, 193 N. Y. 11, 20 L.R.A.(N.S.) 1003, 85 N. E. 827; People v. Schuyler, 106 N. Y. 298, 12 N. E. 783; McKinney v. Grand Street, P. P. & F. R. Co. 104 N. Y. 352, 10 N. E. 544; Treanor v. Manhattan R. Co. 28 Abb. N. C. 47, 16 N. Y. Supp. 536; 4 Wigmore, Ev. § 2389.

4. It is quite universally held that, where a party to litigation seeks to exclude the testimony of a witness on the ground that it is privileged by statute or otherwise, the burden is upon the party desiring to exclude the testimony of the physician, to bring or show it within the terms of the statute granting the privilege. This rule is consonant with common sense and justice, and meets with our approval. People v. Schuyler,

supra, at p. 304; People v. Austin, 199 N. Y. 446, 93 N. E. 57; Griffiths v. Metropolitan Street R. Co. 171 N. Y. 106, 63 N. E. 808, 11 Am. Neg. Rep. 620; Edington v. Ætna L. Ins. Co. 77 N. Y. 564; 4 Wigmore, Ev. 2381. ·We are of the opinion that the burden thrown upon the plaintiff was not sustained, if the determination of the questions rests with the witness.

5. We are, however, satisfied that the question of the privileged character of the testimony is for the court, taking into consideration all the circumstances, and if necessary the opinion of the physician, and the belief of the patient. Griffiths v. Metropolitan Street R. Co. 171 N. Y. 106, 63 N. E. 808, 11 Am. Neg. Rep. 620; Re Redfield, 116 Cal. 637, 48 Pac. 794; Mitchell's Case, 12 Abb. Pr. 249; Edison Electric Light Co. v. United States Electric Lighting Co. 44 Fed. 294; Johnson Steel Street-Rail Co v. North Branch Steel Co. 48 Fed. 191; Roeser v. Pease, 37 Okla. 222, 131 Pac. 534; 4 Wigmore, Ev. § 2383, note 2; 2 Enc. Ev. 115; but see Redmond v. Industrial Ben. Asso. 78 Hun, 104, 28 N. Y. Supp. 1075, affirmed in 150 N. Y. 167, 44 N. E. 769.

6. Would the testimony of the doctor as to the statements made by plaintiff to him on the third visit, to which reference has been made, be privileged under the provisions of the statute? It is obvious that two elements must coincide to bring the testimony of this witness within the prohibition: First, he must have acquired the information while attending the patient in his professional capacity, and second, the information which it is sought to disclose must have been necessary to enable the physician to prescribe or act for the patient.

In the determination of this question, we are not influenced by any previous decisions of this court on the subject. There are none. We are thus left free to consider and determine it as seems most consonant with the purpose of the enactment, and best insures the administration of justice.

Nearly every state has a statute of this nature. They assume various forms, a few being identical with our own, others being much more general. The authorities on the subject are far from uniform. We do not attempt to refer to many, nor to discriminate and distinguish in this opinion between those which are in conflict. It is sufficient to say that we have given them careful and exhaustive examination,

have carefully weighed the reasons given by the respective courts for their conclusions, and, among the vast number of cases on this subject, have selected a few directly in point on statutes identical with our own, which seem to present reasons which are persuasive, and which most clearly tend to the fair administration of justice between parties.

This visit was a week or more subsequent to the birth of the child. The doctor testified that the woman was in a normal condition. Had the information which defendant offered to show as acquired by the doctor relating to the time when the first intercourse occurred between the parties, been disclosed on or prior to his first visit, that is, prior to her confinement, it is apparent that it might have had some bearing upon his method of treating her or the child, but, coming so long subsequent thereto, it is very doubtful if it had any such bearing. In any event, we are unable to see how any question of the promise of marriage, or how her reasons for allowing defendant to have intercourse with her, could aid a physician in prescribing for her, even if he were there for that purpose on the occasion of the third visit. The burden was on the plaintiff to show that this information was necessary to enable the doctor to prescribe. Of course, we are not saying that the fact that he did not prescribe for her would make the evidence admissible. It would be too narrow a construction of the statute to admit the evidence whenever a physician, in seeking to ascertain whether a prescription is necessary, finds none needed. The statute unquestionably applies to information obtained, and necessary to enable the physician to determine whether a prescription is necessary.

The provisions of the section referred to are most wholesome and salutary, when applied to cases coming within the reasons for the enactment of the statute, but, if construed too strongly in favor of the patient, the beneficent effects intended to result from this enactment will be far more than overcome by the injustice which must in many cases result. It would often enable the patient to give his version of an affair, and then exclude all conflicting evidence, and place the opposite party at the mercy of the patient, who might testify falsely, or, by exaggeration or misinterpretation prevail, when, if the true facts were disclosed, no cause of action or defense would be shown. Such a result should not be encouraged when not made necessary by a fair interpretation or an imperative statute, and to hold, as in effect argued, that

26 N. D.—37.

any conversation had by a patient with his physician while attending him as such is privileged would be to repeal by judicial fiat the solemn qualification imposed by the legislature upon the application of the privilege, by rendering the phrase, "which was necessary to enable him to prescribe or act for the patient," totally ineffective.

Of the many authorities bearing on this subject, we have selected for reference a few based on statutes identical with our own, not, however, unmindful of the fact, as we have indicated, that some may be found which apparently sustain respondent's contention. Among these latter are several, where it was offered to show statements made by a patient to a physician in attendance, which appear not to have been made with a view to enabling the physician to prescribe or act, but which were made to a physician employed by the defendant in personal injury actions, and whose employment was as much to acquire information and prejudicial admissions from the patient as to prescribe for him. This case discloses no such facts, and it will be early enough to pass upon such a state of facts when it is before us.

Indiana cases are not, in the main, authority, for the reason that the corresponding statute of that state is much broader than our own, and contains no provision relating to the necessity of the information. However, in a recent Indian case, a question very similar to the one here involved was considered, and it was held that the testimony was not privileged. The report of that case discloses that a physician had attended upon a patient in an effort to relieve her from the consequences of a criminal operation. A few days after attending her, he called to collect his bill. He was asked whether at that visit he had any conversation with the deceased except that which pertained to the collection of his bill. He answered: "None that I can recall; no more than a physician would have with a patient generally,—ask them how they were." It was then proposed to prove that on that occasion the patient told him that the defendant had nothing to do with producing her condition and more to the same effect. This offer was refused. The court says: "It would be a perversion of the statute to hold that the communication in question was privileged." It may be remarked that the purpose sought to be accomplished by the introduction of this evidence was identical with that sought in the case at bar, namely, to prove conflicting statements. Seifert v. State, 160 Ind. 464, 98 Am. St. Rep.

340, 67 N. E. 100.   See also Edington v. Ætna L. Ins. Co. 77 N. Y. 569; People v. Austin, 199 N. Y. 446, 93 N. E. 57; Griffiths v. Metropolitan Street R. Co. 171 N. Y. 106, 63 N. E. 808, 11 Am. Neg. Rep. 620; Benjamin v. Tupper Lake, 110 App. Div. 426, 97 N. Y. Supp. 512; Travis v. Haan, 119 App. Div. 138, 103 N. Y. Supp. 973; Griebel v. Brooklyn Heights R. Co. 68 App. Div. 204, 74 N. Y. Supp. 126; Missouri P. R. Co. v. Castle, 97 C. C. A. 124, 172 Fed. 841; Campau v. North, 39 Mich. 606, 33 Am. Rep. 433; Collins v. Mack, 31 Ark. 684; Re Black, 132 Cal. 392, 64 Pac. 695; Rogers, Expert Testimony, § 43; Smith v. John L. Roper Lumber Co. 147 N. C. 62, 125 Am. St. Rep. 535, 60 S. E. 717, 15 Ann. Cas. 580; and authorities collected in note in 15 Ann. Cas. 582.   See also note in 17 Am. St. Rep. 565; People v. Cole, 113 Mich. 83, 71 N. W. 455.

In the Benjamin Case the court said: "There was also an error in excluding evidence that will require a new trial.   A physician who had treated the plaintiff for the injury was called by the defendant and testified that he had a conversation with her as to the manner in which this accident occurred.   He was then asked: 'What did she tell you as to that?'   This was objected to as incompetent and immaterial.   In reply to questions by the court, the witness stated that 'this talk was while I was making an examination of her case in order to prescribe for her, and as a part of my examination.'   The court sustained the objection, and the defendant excepted.   The witness nowhere stated that it was necessary for him to know how the accident happened in order to enable him to act for the plaintiff in a professional capacity, and it is apparent here that it was not necessary for him to know how the accident happened in order to enable him so to act.   It was sufficient for that purpose that he knew or was informed of the character of the injuries received, and not as to how they were received.   If the plaintiff in such talk made admissions to the physician as to the manner in which the accident happened, it not appearing that the information so acquired was necessary to enable him to act in that capacity, such admissions were not protected by § 834 of the Code of Civil Procedure."

The Campau Case discloses that the plaintiff was a nurse.   At the trial the court excluded certain testimony from Dr. Lichty, her physician.   Plaintiff claimed she was ruptured by blows and other acts of

violence while acting as Campau's nurse. He called Lichty, and sought to prove by him that, while he was attending her in a professional capacity, she told him that she had been ruptured before she went to live with plaintiff, and had not been ruptured by him. The question was objected to, and the trial court sustained the objection. The Michigan statute is substantially like our own as to the competency of a physician's testimony. In disposing of the point on appeal, it was held that the exclusion of that testimony was error. The court said: "The objection and ruling were based on the statute. The common law gives no privilege in such a case. . . . The rule given by the statute is beneficial and based on elevated grounds of policy, and it ought not to be frittered away by refinements. It is not to be forgotten, however, that parties have their rights, and that when one takes the stand as witness to establish, by his or her oath, the cause of action alleged, the state of facts to give immunity under the statute ought to appear distinctly before making any exclusion of proof of contradictory admissions. So far as practicable, the courts ought to see to it that the statute is not used as a mere guard against exposure of the untruth of a party, and that a rule intended as a shield is not turned into a sword. The objection in the present case was not warranted by the facts in the record. The offer was to show Miss North's admission that her rupture was not caused by plaintiff in error, but existed before she went to live with him. This was material, and it does not appear in the record from the doctor's testimony or in any way that, in case she made the admission as to the pre-existence of the rupture, and as to its not being caused by plaintiff in error, it was information 'necessary to enable the doctor to prescribe for her as a physician, or to do any act for her as a surgeon.' And yet this is one of the fundamental conditions for exclusion which the statute specifies."

In the Cole Case, the court said: "2 How. Anno. Stat. (Mich.) § 7516, prohibits a disclosure of any information acquired by any attending physician, 'which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon.' The attending physician was asked if Miss Jordan told him who was the father of her child. This was ruled out as a confidential communication, within the prohibition of the statute. This information was not necessary to enable the physician to prescribe for her,

and the testimony was therefore admissible. . . . Judgment reversed and a new trial ordered."

In the case of Green v. Terminal R. Asso. 211 Mo. 18, 109 S. W. 715, the Missouri court, passing upon a statute identical with ours, uses this language: "The statute does not say, in effect, that the door of the sick room shall be locked once for all. It does not say, in effect, the mouth of the physician . . . shall be closed once for all. The wise general rule being that the admissions of a party to a suit made outside the court room are admissible in evidence against him, the statute does not say that all such admissions made to a physician or surgeon are privileged. It stands precisely the other way. The information under its ban is not all information acquired from a patient, but is such only as was 'necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon.' These are clear words in the law, and under no canon of construction, should they be interpreted out of the law by refinement or . . . fanciful ills. In other words, the danger of frittering away this statute is not to operate as a scarecrow frightening courts from their duty to give to every word of it a due office and meaning, because zealous and astute at all times to see to it that the statute be so construed as not to strike down its obvious purpose."

In the Castle Case, decided by the circuit court of appeals of this circuit, the court through Judge Carland says: "The question then is narrowed down to this: Was the fact that plaintiff told the witness that he was injured by having his foot slip off the brake beam onto the 'T' rail of the track, and one of the car wheels of the first car passing over his foot, a confidential communication properly intrusted to him in his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline? . . . In the case at bar there was beyond question a crushed right leg about 4 inches above the ankle. The injury beyond question was caused by one of defendant's cars passing over plaintiff's leg. Whether the injury was caused by plaintiff's or defendant's negligence was the pivotal question in the case. It is impossible to imagine anything that Castle, the injured person, could say to the physician in reference to the cause of the injury that would in any way throw any light upon the manner of treating the same. How

the leg came to be crushed was for the purpose of treatment absolutely immaterial. What plaintiff told the witness was of no assistance whatever to enable him to discharge the functions of his office. The statute is in derogation of the common law, and often excludes the best evidence. It should not, therefore, be extended to matters of evidence not coming clearly within its provision, as the object and purpose of all trials is the development of the true facts in each case. We find no cases which, under similar circumstances, have held testimony such as was offered in the present case inadmissible."

In the Roper Case, 147 N. C. 62, 125 Am. St. Rep. 535, 60 S. E. 717, 15 Ann. Cas. 580, the North Carolina court passed upon a statute identical with our own except that to it is attached a proviso permitting the presiding judge to compel a disclosure, if, in his opinion, it was necessary to the administration of justice. In that case, the trial court declined to exercise the discretion conferred by the statute and admit the answer as a matter of right in the defendant, and the supreme court held that, in view of such action, it developed upon them to pass upon the meaning and application of the paragraph reading, "which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon." This makes that case directly in point as an authority on the case at bar, and it was held that information given by the patient to the physician, as to how he was hurt, was not privileged.

It has been suggested that the record discloses a mental condition of the plaintiff bordering on melancholia or some form of insanity, which might render it proper and necessary for the doctor to acquire information on the occasion of the third visit, as to the relations between her and the defendant. A careful search of the record, however, discloses nothing which we think justifies such suggestion. It is true that it appears that she wept and was in doubt as to her future course, and there is some testimony to show that her sister found her crying, and told the defendant that if he did not marry her, he would pay for it, and that she replied to her sister and to him that it was no use to do anything; that when she left his house she would leave in her coffin; that she did not want his money; that, "I don't need his money; 5 cents' worth of carbolic acid is all I need." The time of these occurrences and this statement is not definitely fixed, but it is clear, we

think, that they occurred after the third visit of the doctor. When this visit was made she was still in bed, but the conversation to which we have referred, and other acts disclosed in the record surrounding it, but which are of no importance in this connection, took place after she was up and around the house, and are given as having occurred in the. kitchen. Hence, they do not relate to her mental condition at the time of the visit in question, even if they are of enough significance to warrant consideration.

Many of the authorities cited on this question are not in point when carefully read. Many relate only to conversations which left their bearing in doubt. We see no room for doubt as to the information sought to be shown in this case as disclosed by. the record. We conclude that the statements in question are not.shown to be necessary to enable the doctor to prescribe or act for the patient, and that she could have had no reasonable ground to believe them so, and that, hence, they were not privileged.

7. Error is assigned because the court charged the jury that it might take into consideration the pain and physical suffering occasioned by the birth of the child, in assessing damages, if found for the plaintiff. The authorities on physical suffering occasioned by childbirth, constituting a proper element of damages in an action for breach of promise aggravated by seduction, are not in harmony. Some hold that they are too remote from the cause of action, which, of course, is the breach of promise. Others hold to the contrary. It is true that there must be some line drawn, beyond which facts do not constitute an element of damages in such case. In no case can the plaintiff recover all the damages directly and incidentally occasioned by the wrongful act of the defendant. We are disposed, however, to agree with the statement of this doctrine given by Mr. Sutherland in § 985 of his work on Damages, wherein he says: "If seduction is on principle an element of damages in an action for breach of promise, and the disgrace or injury to reputation which follows it is such an element, it seems illogical to exclude any other direct result of the seduction from the consideration of the jury. Mental suffering may result from seduction without pregnancy following, but compensation for disgrace or injury to reputation must be based on the theory that seduction has resulted in pregnancy. Hence the physical suffering and the expense

connected with confinement, where pregnancy follows the seduction, are not more remote than injury to the reputation."

Authorities holding that, in such an action, the fact of the birth of a child may be shown, are not in point on this question, however. In conflict with the opinion of Mr. Sutherland, see Giese v. Schultz, 53 Wis. 462, 10 N. W. 598; Giese v. Schultz, 65 Wis. 487, 27 N. W. 353. We hold that it was not error for the court to charge that the jury might, in case it found for the plaintiff, take into consideration the physical pain incident to the birth of the child, in fixing the damages.

8. The instruction that the jury might take into consideration all the other facts and circumstances in the case, we believe to be too broad, but we cannot say that it was prejudicial to the defendant in the instant case.

9. Other errors occurred in excluding some of the evidence offered by defendant to show that, during the time the plaintiff claimed to have been engaged to marry him, she had received other men as company. It is self-evident that her relations to other men during such time, and the consent or objection of the defendant thereto, might have had an important bearing on the weight to be given the testimony of the plaintiff. If she was keeping company during the period when she claims to have been engaged to marry defendant, with other men, and particularly, if she was doing so with the knowledge of the defendant, and without objection on his part, it certainly would have a tendency to discredit her claims.

The same principle also applies to the sustaining of the objection of plaintiff to the question propounded to her, as to whether she told her sister anything about any talk of marriage, and to the ruling sustaining plaintiff's objection to questions tending to impeach or discredit her evidence relating to the time when the child was begot.

10. It is further the contention of the appellant that the evidence is insufficient to sustain the verdict. To discuss this question fully would require the setting forth of a large volume of the testimony relating to the alleged acts of familiarity and intercourse between the parties, and their relations, and would unduly extend this opinion. We content ourselves with saying that, while the evidence is weak, and not convincing, when taken in connection with all the surrounding facts and circumstances shown, we think it was sufficient to warrant sub-

mitting the issues to the jury. There was evidence tending to show an implied agreement to marry.

11. We have now passed upon all the questions which we think material and likely to arise on a second trial, but may observe that it is claimed that, if the testimony of the doctor was privileged, the plaintiff waived such privilege. It is unnecessary to pass upon this in view of our conclusion that his testimony was not privileged. The order denying a new trial and the judgment of the District Court are reversed.

BURKE, J. (dissenting). The majority opinion, roughly interpreted, holds that there must be a new trial for four reasons:

First, because, while arguing with counsel, the trial court asked whether the doctor could act both as a physician and a detective.

Second, because said doctor was not allowed to testify to that part of the conversation had with plaintiff, which the court says was not necessary for her treatment.

Third, for rulings in the exclusion of testimony, for instance, that the defendant had received other men as company during the time she claims the engagement existed.

Fourth, because there appear minor defects in the rulings of the trial court which, though not error, show upon the whole that the defendant did not have a fair trial. The other paragraphs, namely, numbers four, five, eight, nine, and eleven, do not lead to a reversal.

I respectfully dissent, and will briefly state my reasons for thinking each of the above reasons for reversal unsound.

(1) It is stated in the first paragraph of the syllabus that it was error of the trial court to ask the attorney for defendant if the doctor must not have called either as a physician or a detective. The majority opinion carefully states that this remark would not be reversible error in all cases, but that in this case the issues are very close and therefore the remarks were prejudicial.

Upon general principles, I believe it unwise to distinguish between the different cases. If the error is not pronounced enough to be reversible in all cases, the opinion should be affirmed so far as that assignment is concerned. I do not wish to be understood as sanctioning those remarks, but we should remember that the defendant could

have guarded against the entire incident by asking that the jury be excluded during the argument of this question of law. The plaintiff did nothing whatever to provoke the remark of the trial court; it was defendant's attorney who was arguing with the judge. Why should the plaintiff be penalized so heavily for something which she did not provoke, and which she could not prevent? No two trial courts conduct a case in exactly the same manner, and there is no set standard by which it can be said that one method is better than the others. Many trial judges, including the writer when upon the district bench, believe it better to have the juries listen to the law arguments as they thereby become acquainted with the reasons for the exclusion of offered testimony. Again, principles of law can be readily absorbed by juries, and this tends to a more enlightened citizenship as a whole, the jurors being usually men of influence, disseminating the knowledge thus gained amongst their neighbors. The average juryman is not as easily influenced as some appellate courts seem to think, and the writer for one, after presiding at something over a thousand jury trials, has reached the conclusion that they can safely be intrusted with all the sound legal information that the lawyers and the judge can give them. In the case at bar, the remark was no stronger coming from the lips of the judge, than from the lips of the plaintiff's attorney, and the same thought had doubtlessly suggested itself to each member of the jury before the trial court mentioned it. The facts were such that the truth must be apparent to everyone. The plaintiff was a hired girl, a stranger in the place, and absolutely unknown to the physician until he was called upon to treat her professionally. He had no interest in her excepting as a patient, and if there is any other capacity in which he acted excepting as a physician or a detective, the majority of this court has neglected to mention it. Neither do I believe that a trial court should imitate an oyster. On the contrary, I think the discretion of trial judges should be enlarged. They are men of integrity, learning, and judgment, and can be relied upon to do nothing intentionally wrong. The habit of reversing them because members of the appellate courts think they could conduct the trials in a better manner is one of the greatest evils of our jurisprudence. A reversal in any case is a serious matter, as it means a delay

of justice, expense to the litigants, expense to the taxpayers generally, and congestion of business in the lower courts.

It is my firm conviction that the jury was not influenced one iota by the fact that the said remark was made by the trial judge instead of by the plaintiff's attorney. The trial court promptly charged the jury to disregard his remarks when so requested.

I will not dwell further upon this phase of the opinion, as I consider the next paragraph much more important.

(2) It is stated in paragraph six of the opinion that the conversation between the doctor and plaintiff relative to the subjects of the time of the promise of marriage,—whether there had been a promise of marriage,—and relative to the time of the alleged acts of sexual intercourse with McWilliams, were "not privileged, as it is clear that the questions did not call for information necessary to enable the physician to prescribe or act for her." This I consider a most vicious holding, not only upon the merits of this case, but upon the subject of privileged communication generally. In effect, the majority opinion divides the doctor's conversation into two parts. That which they concede was necessary for him to prescribe for her, and that portion which they contend unnecessary, and they hold that it was error to exclude the latter part of the conversation. In other words, they put the burden upon this sick woman, while undergoing the agonies of childbirth, to determine at her peril whether the questions asked her by her physician were necessary for her treatment. Thus, when the physician said to her, "Q. Did McWilliams ever promise to marry you?" then plaintiff must revolve in her own mind the question of her legal rights. She must first say to herself, "Is this question necessary for my treatment, or is the doctor just carrying on a social conversation with me, or is he trying to get information to help McWilliams in case of a trial?" Having reached the conclusion that the question was not necessary for her treatment, she must say to the doctor: "Now, Doctor, after due deliberation, I have decided that your question is not necessary for you to prescribe for my present illness, and therefore I decline to answer you, but, Doctor, if you will ask me questions necessary to aid you in treating me, I will give you all the information you desire."

This ridiculous situation is a complete answer to the majority opin-

ion, and I could well leave the subject here, were it not that the majority opinion has quoted, from Wigmore on Evidence and three decisions from the Federal, New York, and Michigan courts, certain language which, though since repudiated, and in one instance taken from a criminal case, is liable to mislead the casual reader of this opinion. To understand the subject if privileged communications, it is necessary to look into the history of this legislation somewhat. At page 2381, vol. 40, Cyc. it is said: "At common law there was no privilege as to communications between physician and patient, and this rule still prevails where not changed by statute." The first Code enactment was in New York at the time of the adoption of the Field Code, about sixty years ago. The statute in this state was, of course, adopted considerably later. The majority opinion, following Mr. Wigmore, states that the statute was enacted to prevent physicians from disclosing to the curious the ailments of their patients, particularly one afflicted with reproachful and unpopular diseases. This, I consider the fundamental error of the opinion. While the statute was doubtlessly intended to cover the evil mentioned, yet, it also intended to prevent other evils which had grown up in the country. See Smart v. Kansas City, 208 Mo. 162, 14 L.R.A.(N.S.) 565, 123 Am. St. Rep. 415, 105 S. W. 709, 13 Ann. Cas. 932, and note. At the time of the enactment of most of the statutes, many railway companies, mining corporations, factories, and other large enterprises were establishing hospitals for the treatment of their employees. The physicians in charge of those hospitals were dependent for their positions upon the good will of the corporations, and it was urged that some at least of those physicians were taking advantage of their positions to obtain from the patients information which would tend to defeat a claim for damages. The legislatures of the various states probably felt that injured employees were unable to give a true account of the manner of their injury, and wholly unable to withstand any "third degree work," especially by a physician in whom they should have the utmost confidence. That the legislature intended to remedy this evil is apparent to everybody, excepting Mr. Wigmore and the few courts who have followed him. Upon the enactment of the first privileged communication statutes desperate assaults were made upon the law in attempts to secure the admission of such evidence upon the grounds that

the information obtained by the physician was not necessary for medical treatment. In the early days a few courts were deceived by this sophistry, and those cases are quoted in the majority opinion. However, it did not take long to demonstrate the injustice of this holding, and in recent years there has been a decided tendency towards a liberal construction of the statutes to protect the patient against any traps set for him by the physician. Among the later decisions will be found a case from New York, one from Michigan, and others from the Federal courts, which in effect overrule the earlier cases relied upon by the majority of this court. I have taken the trouble to read all of the cases cited by the majority of this court as well as many others, which for some reason they seem to have overlooked, and I have discovered that, with three possible exceptions, none of the cases cited in the majority opinion support the same, while on the contrary the cases as a whole are simply massed against it. I will quote briefly from some of those cases.

Re Gruendl, 102 Wis. 45, 78 N. W. 169, says: "The purpose of the statute . . . is to facilitate and make safe, full and confidential disclosure by patient to physician of all facts, circumstances, and symptoms, untrammeled by apprehension of their subsequent enforced disclosure and publication on the witness stand, to the end that the physician may form a correct opinion, and be enabled safely and efficaciously to treat his patient."

In McRae v. Erickson, 1 Cal. App. 326, at page 332, 82 Pac. 209, it says: "The intention of the statute is to exclude all statements made by a patient to his physician while attending him in that capacity for the purpose of determining his condition; nor does this construction do violence to the language of the act liberally construed, which we think is to be understood as forbidding a physician to be examined 'as to any information acquired in attending the patient, the acquisition of which was necessary (or which it was necessary for him to acquire) in order to enable him to prescribe or act for the patient.' Of this necessity, from the nature of the case, the physician must commonly be regarded as the sole judge, for it would be obviously unreasonable to require of the patient the exercise of any judgment with reference to the propriety of the questions asked by his physician."

The California statute is almost identical with ours, and reads as

follows: "A licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." Kerr's Code Civ. Proc. § 1881.

When any person attempts to avoid the force of this holding by saying that the statute differs from ours, he has taken untenable grounds. In Battis v. Chicago, R. I. & P. R. Co. 124 Iowa, 623, 100 N. W. 543, it is said: "It may be true, possibly, that the knowledge acquired by the physician was not, in point of fact, and strictly speaking, necessary and proper to enable him to perform the functions of his office, but of this we are not in position to judge, nor are we called upon to determine what the fact might be when reduced to a last analysis. It was the condition of plaintiff that was the subject of the inquiry, and it was the professional judgment of the physician that was called for. The privilege cannot be subject to measurement by metes and bounds, and we may well assume that all that was told to the physician, and all that was developed by his examination or came under his observation, was necessary and proper for his understanding of the condition of his patient. The relation of physician and patient being established, if, by any fair intendment, communications made have relation to the physical or mental condition of the patient, we are bound to hold them privileged."

Briesenmeister v. Supreme Lodge, K. P. 81 Mich. 525, 45 N. W. 977, says: "This statute covers all information which Dr. Inglis acquired by observation while in attendance upon Mr. B. of his condition or ailments, which in any manner enabled him to prescribe for him, as well as to communications made to him by his patient. . . . All disclosures by the patient to his physician respecting his ailments are privileged, whether they are necessary to enable the doctor to prescribe for him as a physician or not."

Obermeyer v. F. H. Logeman Chair Mfg. Co. 120 Mo. App. 59, 96 S. W. 673, is a case where the physician's testimony shows that he had a double purpose. That court says: "The fact that Dr. A. examined respondent at the instance and request of appellant, for the purpose of treating him, did not remove his incompetency. . . . The doctor's testimony shows that he had a double purpose in holding the interview with respondent: First, to ascertain his condition

for the purpose of treating him professionally; second, to ply the boy with questions while he was suffering from shock and severe pain as a result of the recent injury, for the purpose of getting some statement or admission from him that would be advantageous to his (Amyx's) employer, the appellant, in case the boy should sue to recover compensation for his injury. In these circumstances we are not inclined to split the interview into parts and determine what parts were and were not necessary, to enable the doctor to prescribe for the respondent, but to hold him incompetent to testify to any part of the interview."

In Pennsylvania Co. v. Marion, 123 Ind. 415, 7 L.R.A. 687, 18 Am. St. Rep. 330, 23 N. E. 973, 3 Am. Neg. Cas. 261, the court says: "The physician had no business to interrogate his patient for any purpose or object other than to ascertain the nature and extent of the injury, and to gain such other information as was necessary to enable him to properly treat the injury and accomplish the object for which he was called professionally; and such communications are privileged, and he cannot disclose them. If the physician took advantage of the fact of being called professionally, and while there in that capacity made inquiries of the injured party concerning matters in which he had no interest or concern professionally, or for the purpose of qualifying himself as a witness, he cannot be permitted to disclose the information received. The patient puts himself in the hands of his physician; he is not supposed to know what questions it is necessary to answer to put the physician in possession of such information as will enable the physician to properly treat his disease or injury, and it will be conclusively presumed that the physician will only interrogate his patient on such occasions as to such matters and facts as will enable him to properly and intelligently discharge his professional duty, and the patient may answer all questions propounded which in any way relate to the subject or to his former condition, with the assurance that such answers and communications are confidential, and cannot be disclosed without his consent."

The Indiana statute is worded somewhat differently, but has the same general object as our own, and in this connection I assert that, while all of those privileged communication statutes are worded slightly different, they were intended to cover the same evils, and a case under one is exactly in point under another, and it is idle to attempt to

distinguish cases from the different states upon the ground that the statutes are worded slightly differently.

In Doran v. Cedar Rapids & M. C. R. Co. 117 Iowa, 442, 90 N. W. 815, upon similar facts, the court says: "We are not referred to any authorities which make this distinction. It seems to us that whenever an injured party consults a physician, as physician and discloses to him his physical condition, and thus enables him to obtain information which as an ordinary person he would not have obtained, such physician is prohibited from testifying with reference to the knowledge thus obtained."

See also, to the same effect, the following additional cases: Kling v. Kansas City, 27 Mo. App. 231; Edington v. Mutual L. Ins. Co. 67 N. Y. 185; Feeney v. Long Island R. Co. 116 N. Y. 375, 5 L.R.A. 544, 22 N. E. 402; Re Hunt, 122 Wis. 460, 100 N. W. 874; McRae v. Erickson, 1 Cal. App. 326, 82 Pac. 209; State v. Kennedy, 177 Mo. 98, 75 S. W. 979; Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 281, 36 Am. Rep. 617; Dambmann v. Metropolitan Street R. Co. 55 Misc. 60, 106 N. Y. Supp. 221; Jones v. Brooklyn B. & W. E. R. Co. 21 N. Y. S. R. 169, 3 N. Y. Supp. 253; Sloan v. New York C. R. Co. 45 N. Y. 125; Re Redfield, 116 Cal. 637, 48 Pac. 794; Griffiths v. Metropolitan Street R. Co. 171 N. Y. 106, 63 N. E. 808, 11 Am. Neg. Rep. 620; Green v. Nebagamain, 113 Wis. 508, 89 N. W. 520; Colorado Fuel & Iron Co. v. Cummings, 8 Colo. App. 541, 46 Pac. 875; Pennsylvania Co. v. Marion, supra; Thomas v. Byron Twp. 168 Mich. 593, 38 L.R.A.(N.S.) 1186, 134 N. W. 1021, Ann. Cas. 1913C, 686; Union P. R. Co. v. Thomas, 81 C. C. A. 491, 152 Fed. 365; and note at page 945, vol. 13, Ann. Cas.; Munz v. Salt Lake City R. Co. 25 Utah, 220, 70 Pac. 852, 13 Am. Neg. Rep. 214; Patterson v. Cole, 67 Kan. 441, 73 Pac. 54, 14 Am. Neg. Rep. 543; Madsen v. Utah Light & R. Co. 36 Utah, 528, 105 Pac. 799; Burgess v. Sims Drug Co. 114 Iowa, 275, 54 L.R.A. 364, 89 Am. St. Rep. 359, 86 N. W. 307, 10 Am. Neg. Rep. 42; Re Bruendl, 102 Wis. 47, 78 N. W. 169; 10 Enc. Ev. 1064; 23 Am. & Eng. Enc. Law, 86, 87; Potter's Dwarr. Stat. 202.

Space forbids detailed analysis of more of the above cases, but, upon their authority, I assert that, with three possible exceptions, and one of these a criminal case, the cases cited by the majority opinion do not sustain the doctrine announced therein, while the cases as stated above

are simply massed against it. Applying the law to the case at bar, we find that plaintiff has testified positively that the doctor was acting as her physician.

In this connection it is interesting to note that defendant made four offers of proof. He offered to prove that the conversation had with the plaintiff, upon which the majority opinion bases reversal, was first had with the plaintiff upon the occasion of his second visit. Upon this occasion the doctor testifies: "This second trip I have just been asked about was made in my professional capacity. To see her as a physician. Any talk I had with her was while I was there in attendance and inquiring about her health and her condition and that of the child. I was talking with her in reference to her condition, when I asked any questions which I did, or gained the information that I did."

The *identical offer* was made regarding the third conversation, upon which the doctor has testified that he did not make the third visit as a physician, but, having later changed his mind, he testifies:

Q. Doctor, this talk that you had on that occasion you had with the patient, the plaintiff in this case, with reference to assisting you or enabling you to prescribe and to act for her, did you not?

A. Yes, sir.

Again he testified:

Q. Now, it is a fact, is it not, that any information which you received at that time was acquired while you were attending the patient and asking questions concerning her health, which would be necessary for you to prescribe or act for her in her physical condition; that is true is it not?

Q. By the court. If you found she needed it?

A. Yes.

It thus appears that the doctor has testified positively that he was her physician, and had questioned her along the lines indicated to enable him to prescribe for her. The doctor considered the information necessary for her treatment. The trial court has held that the conversation was necessary and privileged, and his holding should not be reversed excepting for an abuse of discretion. The patient was a hired girl, poor and friendless, a stranger in the country and absolutely unknown

26 N. D.—38.

to the doctor. Any conversation that he held with her must have been either in his professional capacity, as a private detective of McWilliams, or strictly social. We can dismiss the last without comment; the doctor had no social interest in the girl. Let us say that his high sense of honor prevented him from interviewing the girl in the interest of McWilliams; then why did he ask her about her relations with Mc-Williams? The majority opinion says that the information was not necessary. My learned brothers should have said that *they saw no necessity* for it. An examination of the evidence quickly discloses why the doctor considered this information necessary. It is so well known that the courts can almost take judicial notice of the fact that the mothers of illegitimate children sometimes attempt to injure the child, and sometimes attempt to kill the father, and sometimes attempt suicide. Any physician who does not know those simple facts and make inquiry of the patient along this line is neglecting a serious duty. That there was such a necessity in this case will be seen by reading the following testimony quoted from the record: The plaintiff states: "Mc-Williams did state to me after the baby was born, that he did not know whose baby it was. This was four days after the baby was born. George came to the room about ten minutes after the baby was born. The doctor was in there. He heard the baby cry and says: 'My God, my God!' and went out again. The first conversation I had with him after the baby was born, I said, 'George, can I talk with you? and he said, 'Yes.' I said, 'George, what is to become of me?' He said, 'Well, you have dragged all this upon yourself; you can stay here until you get well and then I don't care where you go,' and I said, 'What shall I do with the baby?' and he said, 'You can put the baby in a convent.' " Plaintiff's sister, who was a witness upon the trial, testified to a conversation between plaintiff and defendant had a few days after the baby was born, wherein the plaintiff "was crying so hard that I had to go out there; and when I came in she says, 'Selma, I am all alone in the world with my disgrace, what shall I do?' I says, 'Anna, you are not alone in your disgrace. George McWilliams is the father of your child, in the rocking chair in the sitting room, and he has got to marry you.' " Whereupon the witness turned to McWilliams and said: " 'If you do not marry her, you will pay for this. If there is a law in the state of North Dakota we will go for it, and we will see what we can do,' and

then my sister cried so hard, and she says: 'Oh! don't fight with him. All I want is 5 cents' worth of carbolic acid, and that is all I want because I will never leave this house with the baby in my arms; *when I leave this house I leave in my coffin.*' " These extracts from the testimony are given to show that the doctor well knew the necessity for ascertaining the mental condition of the plaintiff to determine whether or not there was danger of suicide, injury to the child, or injury to McWilliams. In making those inquiries to properly care for his patient, he naturally learned the facts regarding the date of intercourse and the dispute regarding marriage with McWilliams, and he should not be allowed now to disclose that information without her consent. My conclusion is that the testimony of the doctor should have been excluded.

(3) In paragraph ten of the syllabus it is said, "Certain evidence examined and held erroneous." In the body of the opinion it is explained that the errors consisted in exclusion of testimony, for example, that plaintiff received calls from other men during the time of the alleged engagement to McWilliams.

Taking up the alleged exclusion of the evidence as to visits of other men. I quote from the record to show that every scrap of this kind of evidence was admitted without objection, unless some plain violation of the rules of evidence appeared.

The specification of error upon which the majority opinion pass is as follows: "The court erred in sustaining plaintiff's objections to the following questions propounded to plaintiff on cross-examination, to wit:

"Q. Later than that there was another man out there one night to call on you, was there not?

"Q. In the month of September did you have a man call on you at the McWilliams's place when you were there alone?

"Q. You sent for him to come up to your place, to the McWilliams's place?

"Q. Did you send for Elmer Hanson to come up after the baby was born?"

Those are four questions asked of the plaintiff herself upon cross-examination, excluded by the trial court, and held by the majority to be error. The majority opinion states a lot of elementary law relative to the right of the defendant to show plaintiff's relations with other

men at the time she claims to have been engaged to him. The opinion was evidently written without a close examination of the record. It appears from a careful examination that the four questions above mentioned were shut out upon perfectly proper grounds, and that the plaintiff was cross-examined upon this very subject until counsel got tired and quit. To show that this is the case, I set out herein a part of her testimony containing the rulings of which complaint is made.

The plaintiff was asked upon cross-examination:

Q. Now you say that when you went to those various places you asked George whether you could go or not?   .   .   .

A. I stated that on some occasions I asked George if I could go. I asked him to get his permission to go. He told me that I could go. He says it is all right if I went. He says he don't care to go out any place anyway, and if I get a chance to go out with somebody he said it is all right, because he was too old to go to dances and entertainments.

Q. And he told you that it was all right for you to have young men taking you around?

A. Yes, he didn't object, he said it was all right. He told me it was all right and wanted me to go. On the occasion I went with Hanson to the dance, I left McWilliams's place about 8 o'clock in the evening and did not get back until about breakfast time. My sister and I went to a bowery dance. My sister said it was Swanson's grove. George did not go along. George was at the Bryan meeting and at the Billy Bennett show when I went to those place with Hanson. Between the 1st of April and the 1st of July, I was in Hanson's company four times. I was out with him four times. He was there one Sunday to visit. That is all I can remember.

Q. In the first week you were at McWilliams's place he called on you, didn't he?

A. Yes.

Q. That wasn't Sunday?

A. No, it was the middle of the week. Not the first time. The first time he called on me was in the afternoon of the second week. I used to talk with him over the phone. He used to call me up and talk to me.

And again she testifies: "I have testified in regard to a man named

Elmer Hanson. He came to McWilliams's place a few days after I got there. It was not the first week. It must have been the second week. He remained there about an hour." And so on for many pages of the printed record. She further testified that Hanson was her sister's intended husband.

After all of this testimony, she was asked the following question:

Q. Later than that there was another man out there to call on you, was there not?

A. I can't remember.

Mr. Cuthbert: That is objected to as too indefinite and not proper cross-examination unless for an impeaching question, and then it is too indefinite as to time and as to place and description. (Sustained by the court and exception granted defendant.)

The Court: The main question in this case is, Was there a promise of marriage? There may have been a thousand men out to see her, but the main question is, Was there a promise of marriage?

Mr. Sinkler: I will make an offer of proof.

The Court: There is no use making an offer of proof; the best way is to ask legitimate questions, but I will allow you to make any offer of proof you wish. Have you it in writing?

A. I have.

The Court: Submit it to me.

Mr. Sinkler: I have not on that particular point.

Q. In the month of September did you have a man call on you at the McWilliams's place while you were there alone?

Mr. Cuthbert: Objected to as improper cross-examination, not a proper impeaching question, and immaterial. (Sustained and exception granted.)

A. In the month of April I did not have a man call on me outside of Elmer Hanson at night. There was never anyone else but Elmer Hanson. I had a conversation with Elmer Hanson after the baby was born.

Q. You sent for him to come up to your place, to the McWilliams's place?

Mr. Cuthbert: Objected to as not proper cross-examination, not a proper impeaching question, and as immaterial. (Sustained and exception granted.)

A. I had a talk with Elmer Hanson over the phone a few days after the baby was born. In the conversation over the 'phone I did not say

to Elmer Hanson, "Come up and see the baby, it looks like George. God knows you ain't the father, and we don't blame you for it." I did not say that in substance.

Q. Did you send for Elmer Hanson to come up after the baby was born ?

Mr. Cuthbert: Objected to as immaterial, not proper cross-examination, and not proper impeaching question. (Sustained and exception granted.)

How, in the face of the record, the opinion can assert that "error occurred in excluding the evidence offered by defendant to show that, during the time the plaintiff claimed to have been engaged to marry him, she had received other men as company," is absolutely beyond my powers of comprehension.   As stated above, the plaintiff was cross-examined upon this subject without let or hindrance, and without objection, unless the questions themselves contained some specific objection. Thus, to the first question, namely: "In the month of September, did you have a man call on you at the McWilliams's place while you were there alone ?" the objection was properly sustained if for no other reason than the lack of a definite date.   To the question: "Later than that there was another man out there one night to call on you, was there not ?" the objection was interposed that it was too indefinite as to time and as to place and description.   This objection was sustained and very properly so.   The question was not confined to any period of time, and certainly not to the time during which it was alleged that the engagement existed.   And to the question: "You sent for him to come up to your place, to the McWilliams's place ?" the objection was interposed and sustained for the very good reason that no time was specified as the date of such visit.   And the last question, to wit, "Did you send for Elmer Hanson to come up after the baby was born ?" for the first time is definite as to time, and shows that the visit occurred after McWilliams had repudiated the alleged contract of marriage.   Certainly the fact that she sent for a friend after her repudiation by McWilliams in no manner tended to show conduct inconsistent with her claim that an engagement had existed nine months before that time.   It thus appears beyond question that no evidence sought to be elicited by proper questions was excluded relative to her conduct with other men.

(4) In the second paragraph of the syllabus it is stated that many minor errors disclosed in the record, all unfavorable to the defendant, considered in connection with the whole record, indicated that he did not have a fair trial. In the body of the opinion, it is said: "We do not say that any one of these minor errors was sufficient to justify a reversal, but we do think they go a long way towards showing that defendant did not have a fair trial." These quotations are all that appear in the opinion, and we are left in the dark as to the number and identity of those "minor errors." It is, however, not unfair to assume that they are less serious than the one treated by me in the last paragraph, and I decline to concur in a reversal based upon a cat in the bag proposition.

In conclusion, and in a general way, I consider a reversal in any case a misfortune. It delays justice, and makes costs to the litigants and the community. In the case at bar the injustice is especially marked. Plaintiff is a hired girl who earns $6 per week. Defendant admits he is worth over $70,000. This action was begun four years ago this month, and has been very expensive litigation. To order a new trial may practically deny plaintiff any legal redress whatever.

Goss, J. I concur in the foregoing dissent.